**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Glover*, Slip Opinion No. 2024-Ohio-5195.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports.  Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2024-OHIO-5195

THE STATE OF OHIO, APPELLANT, *v*. GLOVER, APPELLEE.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State v. Glover*, Slip Opinion No. 2024-Ohio-5195.]**

*Criminal law—Sentencing—R.C. 2929.14(C)(4)—Consecutive-sentence findings—R.C. 2953.08(G)(2)—Appellate review of consecutive sentences—Court of appeals' judgment reducing appellee's consecutive prison terms reversed and consecutive sentences imposed by trial court reinstated.*

(No. 2023-0654—Submitted February 7, 2024—Decided November 1, 2024.)

APPEAL from the Court of Appeals for Hamilton County,

No. C-220088, 2023-Ohio-1153.

_____

DEWINE, J., announced the judgment of the court and authored the opinion of the court with respect to the analysis and disposition of the State's second proposition of law, which KENNEDY, C.J., and DETERS, J., joined.  FISCHER, J., concurred in the judgment and concurred in part, with an opinion.  STEWART, J., dissented, with an opinion joined by DONNELLY and BRUNNER, JJ.

**DEWINE, J.**

**{¶ 1}** This case concerns an appellate court's review of a trial court's imposition of consecutive sentences. Tommy Glover committed a series of armed robberies and kidnappings that resulted in his convictions for 11 first-degree felonies along with six gun specifications. The trial court chose to impose consecutive sentences for some of the offenses and specifications and concurrent sentences for others, resulting in an aggregate term of 60 years of incarceration—out of a possible 139 years. The First District Court of Appeals reversed the sentences, finding that the aggregate sentence was "disproportionate to Glover's criminal history, [the] danger he posed to the public, and [his] offenses." 2023-Ohio-1153, ¶ 102, 108 (1st Dist.). It then modified Glover's sentences to run all his felony-conviction sentences concurrently, resulting in a single seven-year term. *Id*. With the addition of the six three-year sentences for the gun specifications (which were not challenged on appeal), Glover's new, reduced aggregate sentence amounted to 25 years. *Id.* at ¶ 106.

**{¶ 2}** The State complains that the court of appeals improperly substituted its judgment for the trial court's, misread the record, and relied on factors that are not part of the statutory scheme. We agree with the State that the appellate court erred when it vacated and modified the sentence. Under R.C. 2929.14(C)(4), the "consecutive-sentencing statute," a trial court may impose consecutive sentences only if it makes certain findings. Under R.C. 2953.08(G)(2), the "appellate-review statute," an appellate court may modify or vacate the imposition of consecutive sentences when it "clearly and convincingly finds" that "the record does not support the sentencing court's findings." The appellate court in this case did not properly apply the appellate-review statute, and the record does not justify its modification of the sentence that the trial court imposed.

## I. BACKGROUND

{¶ 3} In May and June of 2020, Glover went on a crime spree, terrorizing the communities of St. Bernard and Norwood. The trial court found Glover guilty of six counts of aggravated robbery in violation of R.C. 2911.01(A)(1), and five counts of kidnapping in violation of R.C. 2905.01(A)(2), with all 11 counts carrying penalty-enhancing gun specifications. Because this case involves a review of the sentence imposed by the trial court, we begin by recounting Glover's crimes as described in the trial testimony, presentence-investigation report, and victim-impact statements.

### A. Victim 1—Andrew

{¶ 4} In late May 2020, at about 1:00 a.m., Andrew was walking in his neighborhood, trying to get some exercise while it was cool out. Suddenly, two men wearing black hoodies approached. One of the men, Glover, asked for directions to Reading Road and then pulled a gun. While Glover held Andrew at gunpoint, his partner searched Andrew and rifled through his wallet. The two men then directed Andrew to his car and forced him into the driver's seat.

{¶ 5} Glover made Andrew drive to a nearby bank drive-through ATM, where he held a gun to Andrew's head as they waited for a car in front of them to depart. At Glover's insistence, Andrew withdrew $1,300 from the machine in three increments. Next, Glover required Andrew to drive to another bank. When they arrived, Glover pointed the gun at Andrew as they walked to the ATM. But Andrew could not withdraw any more money because he had reached his daily limit. Andrew later recounted that he "really thought [he] was going to be killed" when he could not obtain any more cash.

{¶ 6} Glover and his partner then forced Andrew to drive around in neighborhoods that were unfamiliar to him. Glover made Andrew speed and run red lights, warning him that he "would blow [his] brains out" if he refused. Finally, at a stop sign on Cincinnati's west side, Glover and his accomplice got out of the

car and Andrew drove away. Unfortunately, this was not the last time Glover would victimize Andrew.

{¶ 7} A few weeks later, as Andrew was getting into his car outside of his apartment, Glover jumped him again. He drew his gun and demanded that Andrew drive to a bank in St. Bernard. This time, Glover was wearing a black "COVID mask," and he did not have an accomplice with him. But just like before, Glover forced Andrew, at gunpoint, to make withdrawals from an ATM until he reached his $1,300 limit. Glover then made Andrew drive around for 20 to 25 minutes before getting out of the car.

{¶ 8} Understandably, the robbery-kidnappings inflicted severe emotional trauma on Andrew. He moved back in with his father because he was afraid to be alone or leave his house and because he "couldn't sleep." He spent nearly $600 dollars to have his car painted out of fear that Glover would target him again. Andrew said that he "will always carry some emotional scars from these events."

### B. Victim 2—Janet

{¶ 9} Several days after Andrew's kidnapping, Janet was walking to her car after finishing her shift as a home healthcare aide. As she inserted her key into the ignition, her front and back passenger-side doors suddenly opened. Glover pointed a gun at her and told her to hand over all her money, causing Janet to think, "Oh My God, I'm dead." Glover climbed into the front passenger seat, while his accomplice who had opened the back door, remained outside the car. Glover told Janet to give him all her money and went through her purse and wallet. Begging for her life, Janet said that she did not have any money. After taking $10 or $15 from Janet's wallet, Glover demanded more money and ordered her to drive to an ATM. "[S]cared to death," Janet again begged for her life telling Glover that she did not have even $20 to withdraw. Nonetheless, Glover then ordered Janet to begin driving toward an ATM while he continued to display his gun. After several minutes, however, he directed her to stop the vehicle. As Glover got out of her car,

with only the cash that he had taken from Janet's wallet, he told her, "If you're lying, I'm going to kill you." When Janet later reviewed a photo line-up, she was visibly shaking as she identified Glover.

{¶ 10} Janet testified that since the crime, whenever she wants to go somewhere, she asks "somebody to go with [her], or [she] won't go at all." In her victim-impact statement, she explained that the incident so severely traumatized her that she "won't go out in the dark," always calls someone on her way home from work, and carries a taser. Janet stated that "[Glover] put fear in my life that I can't get rid of. I get sick to my stomach." She constantly thinks of Glover "demanding she drive somewhere, only to shoot her and leave her for dead." She requested that Glover receive the maximum sentence.

### C. Victims 3, 4, and 5—Robert, Maya, and Jacob

{¶ 11} At about 1:00 a.m. in late June 2020, Robert went to retrieve something from his car, a blue Chevrolet Aveo, which was parked by his apartment near Xavier University in Norwood. As Robert was walking back to his building, Glover and an accomplice approached him. They flashed their guns and threatened to shoot him if he did not give them money. Robert told his assailants that he did not have money and that his bank card would be of no use to them because his account was already overdrawn. So, they took his phone, keys, and car instead. Robert returned to his apartment and had his girlfriend call the police.

{¶ 12} Just a block away from Robert's apartment, two Xavier University nursing students, Maya and Jacob, had plans to enjoy pizza and a movie at Jacob's house. Jacob had just parked his roommate's SUV near his home. He and Maya exited the SUV and began to walk toward Jacob's house when they noticed a blue Aveo in the middle of the road. Glover and an accomplice approached Maya and Jacob, demanding money. Glover had a gun and was wearing a fanny pack and an evil-clown mask. Jacob and Maya said they did not have any cash but offered their belongings and credit cards instead. Glover and his partner instructed them to get

back into the SUV. Glover sat in the front passenger seat and forced Jacob to drive while his partner sat in the back with Maya.

{¶ 13} First, they drove to an ATM at Xavier University Station. Glover handed the gun to his accomplice and told him to stay in the vehicle with Maya and to shoot her if she did anything. Jacob then exited the SUV and approached the ATM while Glover accompanied him. Jacob withdrew the maximum amount he could—around $400. When they got back to the SUV, the accomplice returned the gun to Glover. Glover told Jacob to drive to an ATM near the University of Cincinnati. Again, Glover passed the gun to his partner and forced Jacob to withdraw his limit from the ATM.

{¶ 14} They then went to a third ATM where the men again forced Jacob to withdraw his limit from the ATM. They also tried to withdraw money from Maya's account, but they were unable to do so because her cellphone was off and she was unable to respond to the authorization message from her bank. As they drove away, one of the men threw Robert's phone out the window.

{¶ 15} After the third ATM, Jacob explained that he had reached his daily withdrawal limit but offered Glover a $1,500 prepaid credit card that Xavier University had given to students. Glover rejected the offer and grew frustrated with the situation.

{¶ 16} Glover forced Jacob to keep driving. As they drove around, Glover and his partner joked about robbing Robert and how they had taken his phone and his car. "The scariest part" of the ordeal according to Jacob, was when they forced him to drive down an unfamiliar alley. Eventually, Glover made Jacob drive down a dead-end street in the area of St. Bernard and Avondale. There, Glover took Jacob's and Maya's phones and placed them in the trunk, and he and his accomplice got out of the vehicle, allowing Jacob and Maya to drive away.

{¶ 17} Since the crime, Robert no longer goes outside to take walks around his building. Maya had struggled with anxiety even before the incident, but she

6

was "in a good place" until Glover kidnapped and robbed her. Since then, she has been afraid to be alone, cannot sleep at night, and needs to call her mom before stepping outside of her home. Jacob is "anxious now; all the time on edge." He now sees "black men as a threat." And despite never having been in favor of mass incarceration, he explained that the incident had "completely changed" him, and he requested that Glover receive the maximum sentence.

### D. The sentencing hearing

{¶ 18} At the sentencing hearing, Glover initially declined the opportunity to say anything to the court. The assistant prosecutor emphasized the severity of the separate crimes, and she noted that Glover had not accepted responsibility for his actions. In response to defense counsel's statement that the State had initially offered a 15-year plea deal, she explained that the State no longer considered such a sentence appropriate. That offer, she said, was a "gift," made "to save these people from coming in and having to relive what happened to them, having to see the defendant in Court." The assistant prosecutor also pointed out the severe emotional harm that had been inflicted on the victims, particularly Andrew who had been victimized twice and was "a little developmentally delayed." She told the judge that the victims were in favor of anywhere from 20 years to the maximum prison term, and she would defer to their recommendations.

{¶ 19} The two investigating officers also spoke at sentencing. Sergeant Klingelhoffer recounted that he had been an officer in Norwood for 11 years and that Glover's conduct was "essentially one of the worst crimes" he had ever had to investigate and something that he would "remember for the duration of [his] career." It was a "terrible summer," he added. Detective Ingram told the court that he had been an officer in St. Bernard for 22 years and "[t]his will be embedded in my memory just as the victims." He emphasized that Andrew was "developmentally delayed" and had been "victimized twice" and that Glover had

shown no remorse. Detective Ingram said he "thank[ed] God every day that [Glover] didn't pull the trigger on any of [his victims]."

{¶ 20} After the officers had spoken, the court offered Glover a second opportunity to speak. Glover responded, "Reasonable doubt that I did these crimes," and then declined to say anything further. When the court summarized how serious the offenses were, it noted that Glover was rolling his eyes.

{¶ 21} The court indicated at the sentencing hearing that it had considered the presentence-investigation report and the victim-impact statements. The presentence-investigation report showed that Glover's only prior adult criminal conviction was for obstructing official business and that he had a juvenile adjudication in 2016 for "Assault on teachers" in Lucas County for which he had been sentenced to one year of probation. Each of the victims provided statements that detailed the trauma and long-term emotional damage they had suffered as a result of Glover's actions.

{¶ 22} The trial court imposed a sentence that was a blend of concurrent and consecutive sentences. For each of the 11 felony counts, the court was authorized to impose a minimum sentence of 3 to 11 years. R.C. 2929.14(A)(1). Each felony count also carried a three-year and a one-year gun specification. *See* R.C. 2929.14(B)(1)(a); R.C. 2941.141 (one year for having a firearm while committing the offense); R.C. 2941.145 (three years for displaying or brandishing a firearm while committing the offense).

{¶ 23} For each of the 11 first-degree felonies, the court imposed a sentence of seven years, a term that was at the middle of the 3-to-11-year sentencing range. R.C. 2929.14(A)(1). It then ordered that the sentences for the six robbery counts run consecutively. The court determined that the remaining five kidnapping sentences would run concurrently with the robbery sentences.

{¶ 24} The trial court merged the two gun specifications for each incident, and it sentenced Glover to a three-year gun specification for each of the six

aggravated-robbery counts and ordered that the sentences for the specifications run consecutively to and prior to the sentence for the underlying felony. All told, Glover's aggregate sentence totaled 60 years out of a possible 139 years.[1]

{¶ 25} In rendering its sentence, the trial court emphasized the extreme fear and lasting psychological harm that had been inflicted on each of the victims. It explained that the "horror and terror" that Glover put his victims through "lasted for hours" and that Glover had "changed the li[ves]" of all five of his victims. The court went through the victims one by one and detailed the trauma and harm that each had suffered. For example, the court said that Glover had caused Maya, "who already had anxiety and was doing pretty well," to take "a million steps [back] going through anxiety again, getting more counseling." The court also said that Glover did not have "a terrible record," but it noted that he was only 23 and did already have convictions for assault on teachers and obstruction of justice. In addition, the court noted that Glover had shown a lack of remorse and failed to take responsibility for his actions.

{¶ 26} The court made each of the findings required by the consecutive-sentencing statute. The court found that consecutive sentences were necessary "to protect the public, and to punish [Glover], and [were] not disproportionate to the seriousness of [his] conduct and [the] danger [he] pose[d] to the public." *See* R.C.

---

1. Glover could have received 121 years (a maximum of 11 years on each count) if the sentences for the felony counts had all been run consecutively, plus three years on each of the six three-year gun specifications. (Although Glover was found guilty of 11 gun specifications, the trial court merged the three-year and one-year specifications, leaving only six three-year sentences available for sentencing.)

Under the Reagan Tokes Law, 2018 Am.Sub.S.B. No. 201, 11 years is the maximum "stated minimum term" for which an offender may be sentenced for a first-degree felony. R.C. 2929.14. In addition to imposing a minimum term, which in this case would amount to all terms that are to be served consecutively, a trial court is also required to determine a maximum term that is equal to the minimum term imposed on the offender plus 50 percent of that term R.C. 2929.144(B)(1). The trial court in this case, however, concluded that the Reagan Tokes Law was unconstitutional and therefore did not determine a maximum prison term, a decision that the State did not challenge on appeal. We have subsequently upheld the constitutionality of the Reagan Tokes Law. *State v. Hacker*, 2023-Ohio-2535, ¶ 40.

2929.14(C)(4). The court also found that consecutive sentences were necessary "because the harm caused by two or more of the offenses [was] so great or unusual that no prison term for any of the offenses committed, as part of one or more courses of conduct adequately reflect[ed] the seriousness of [Glover's] conduct." *See* R.C. 2929.14(C)(4)(b). In addition, the court found that Glover had a "criminal history which show[ed] violence in school." *See* R.C. 2929.14(C)(4)(c).

### E. The First District reverses and modifies Glover's sentences

{¶ 27} Glover appealed his convictions and his sentences. The First District affirmed the convictions, but it reversed the 60-year sentence and ordered the trial court to impose a 25-year sentence. 2023-Ohio-1153 at ¶ 106-108 (1st Dist.).

{¶ 28} The court of appeals explained that there was "no dispute" that the trial court had made the required findings to impose consecutive sentences. *Id*. at ¶ 66. But it concluded that the record did not support two of these findings. *Id*. at ¶ 85. The appeals court cited a wide range of reasons to support its decision.

{¶ 29} It first noted that the State had offered a 15-year plea deal prior to trial. *Id*. at ¶ 60. It also represented that after trial the State had recommended a sentence of between 20 and 25 years. *Id*. The court did not, however, explain how either circumstance was relevant to its review of the trial court's consecutive-sentence findings.

{¶ 30} The court of appeals also opined that under this court's (now-vacated) decision in *State v. Gwynne*, 2022-Ohio-4607, ¶ 1, *vacated by State v. Gwynne*, 2023-Ohio-3851, it was appropriate to consider the aggregate prison term in reviewing a trial-court sentence that included consecutive sentences. 2023-Ohio-1153 at ¶ 72 (1st Dist.). The court of appeals emphasized that Glover's victims suffered no "physical harm," *id.* at ¶ 75, 96-98, and that the "lack of physical harm weighs against stacking all of the seven-year aggravated-robbery sentences," *id.* at ¶ 96. It then pointed to "[a] selection of Ohio cases" involving both emotional and physical harm, "such as rape, sexual conduct with minors, murder, attempted

murder, and assault," and found that "while courts impose lengthy sentences, many are shorter than 60 years." *Id*. at ¶ 77. The court also cited a handful of other cases that involved "emotional trauma, but no or minimal physical harm" and found that in such cases, "courts often impose significantly shorter sentences than 60 years." *Id*. at ¶ 78.

{¶ 31} With this "backdrop," *id*. at ¶ 79, the court of appeals turned to the trial court's sentencing findings. It held that "the trial court's findings involving proportionality under R.C. 2929.14(C)(4) and criminal history under R.C. 2929.14(C)(4)(c) were clearly and convincingly not supported by the record." *Id*. at ¶ 85.

{¶ 32} For both findings, the court of appeals concluded that the trial court erred by considering Glover's prior adjudication for "assault on teachers" in its consideration of Glover's history of criminal conduct. *Id*. at ¶ 92. The court noted that the presentence-investigation report did not provide any details of that offense. *Id*. at ¶ 30. And although the report did not identify the statute under which Glover was adjudicated, the court of appeals assumed that Glover was adjudicated under a provision of the Toledo Municipal Code.[2] *Id*. Relying on that code provision, the court hypothesized that Glover's juvenile adjudication "could have been based on something as trivial as [a] nonviolent disruption of a class or even a pep rally." *Id*. at ¶ 92. On this basis, the court of appeals held that the trial court erred by taking Glover's juvenile adjudication into account. *Id*. at ¶ 95.

{¶ 33} The court also found that Glover's current aggravated-robbery and kidnapping offenses did not support the trial court's proportionality finding. 2023-Ohio-1153 at ¶ 100 (1st Dist.). It concluded that the lack of physical harm undermined the trial court's proportionality finding. *Id*. at ¶ 101. In doing so, it pointed out that under the Revised Code, the sentence for a single instance of a

_____

2. The court of appeals cited to Toledo Mun.Code 537.16. 2023-Ohio-5311 at ¶ 30, 90 (1st Dist.).

violent crime, including murder, could be lower than Glover's aggregate sentence. *Id*. at ¶ 98. Thus, "a person who purposely takes another person's life" could be eligible for parole after 15 years, but Glover, "who did not take his victims' lives or cause them physical harm, would have no chance of parole at 15, 20, 25, or even 50 years." *Id*.

**{¶ 34}** The court conceded that "To be clear, we do not suggest that under the facts of this case, the trial court could not have stacked *some* of the sentences. Rather, we are firmly convinced that the record does not support the trial court's proportionality finding based on it stacking *all* the aggravated-robbery and gun-specification sentences." (Emphasis in original.) *Id*. at ¶ 100.

**{¶ 35}** The court of appeals acknowledged that it did not have the authority to review the 18 years that Glover received on the gun specifications, explaining, "Glover's appeal did not specifically mention the consecutive sentencing for the gun specifications. And for penalty-enhancing specifications, a trial court need not make consecutive-sentence findings." *Id*. at ¶ 105.

**{¶ 36}** The court then invoked its power to modify the felony sentences under R.C. 2953.08(G)(2), concluding, "[B]ecause the trial court's proportionality findings were clearly and convincingly unsupported by the record, we default to a single seven-year sentence for aggravated robbery," *id*. at ¶ 106. It added that seven-year sentence to the unchallenged 18-year sentence for the gun specifications, thus ordering an aggregate sentence of 25 years. *Id*.

## II. ANALYSIS

**{¶ 37}** We accepted the State's appeal on two propositions of law that challenge the court of appeals' review of the trial court's consecutive-sentence findings. 2023-Ohio-2664. Before we get to the State's propositions, we explain the statutory framework for the imposition of consecutive sentences and for appellate review of such sentences.

### A. Ohio's consecutive-sentencing scheme

{¶ 38} Ohio law presumes that a defendant convicted of multiple crimes will serve his sentences concurrently. R.C. 2929.41(A). A court may impose consecutive sentences only when some law specifically permits it to do so. *Id.* R.C. 2929.14(C)(4) is one such law. Under R.C. 2929.14(C), a court must engage in a three-step analysis before it may impose consecutive sentences. First, it must find that consecutive sentences are "necessary to protect the public from future crime or to punish the offender." *Id.* Second, the court must find that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." *Id.* Finally, the court must find "any of the following":

> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

*Id.* In this case, the trial court found that the second and third conditions were met.

**{¶ 39}** Ordinarily, appellate courts defer to the broad discretion trial courts have in making sentencing decisions, and R.C. 2953.08(G) reflects that deference. *See Gwynne*, 2023-Ohio-3851, at ¶ 11 (lead opinion), quoting *State v. Rahab*, 2017-Ohio-1401, ¶ 10 (lead opinion). That makes sense: the trial judge presided over the trial and heard the witnesses testify, the defendant made his allocution to the sentencing judge directly, and the trial judge will often have heard directly from the victims at sentencing. Thus, an appellate court's role is not to be a "second-tier sentencing court." *State v. Ladson,* 2016-Ohio-7781, ¶ 9 (8th Dist.); *see also State v. Jones*, 2020-Ohio-6729, ¶ 41-42. Appellate courts possess no inherent right to review a felony sentence. Indeed, "[e]xcept to the extent specifically directed by statute, 'it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.' " *Williams v. United States*, 503 U.S. 193, 205 (1992), quoting *Solem v. Helm*, 463 U.S. 277, 290, fn. 16 (1983).

**{¶ 40}** The appellate-review statute provides the sole basis for an appellate court's review of consecutive sentences:

> The court hearing an appeal [of a sentence that includes consecutive sentences] shall review the record, including the findings underlying the sentence or modification given by the sentencing court.
>
> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's *standard for review is not* whether the sentencing court *abused its discretion*. The appellate court may take any action authorized by this division if it *clearly and convincingly finds* either of the following:

14

> (a) That the *record does not support* the sentencing court's findings under division . . . (C)(4) of section 2929.14 . . . .
>
> (b) That the sentence is otherwise contrary to law.

(Emphasis added.)  R.C. 2953.08(G)(2).

## B.  The appellate-review statute limits and guides a court of appeals' review of consecutive sentences

{¶ 41} The State's first proposition of law postulates that an appellate court should not "focus on a defendant's aggregate prison term when . . . reviewing consecutive sentences."  The State's second proposition of law states that a court of appeals may not "substitute its judgment for that of the trial court" when reviewing a sentence under the appellate-review statute.

{¶ 42} Both of the State's propositions represent correct statements of the law, though a fuller explanation is required.  The plain language of the appellate-review statute directs the appellate court's inquiry.  The court must review the trial court's consecutive-sentence findings, and it may "increase, reduce, or otherwise modify" consecutive sentences only if it "clearly and convincingly" finds that the record does not support the trial court's findings, R.C. 2953.08(G)(2)(a), or it clearly and convincingly finds that "the sentence is otherwise contrary to law," R.C. 2953.08(G)(2)(b).

{¶ 43} Nowhere does the appellate-review statute direct an appellate court to consider the defendant's aggregate sentence.  Rather, the appellate court must limit its review to the trial court's R.C. 2929.14(C)(4) consecutive-sentencing findings.  In this case, the court of appeals purported to review the trial court's findings.  But much of its analysis focused on its disagreement with the aggregate sentence.  The appellate court emphasized that Glover's aggregate sentence was "tantamount to a life sentence," 2023-Ohio-1153, ¶ 59 (1st Dist.), and determined that it was too harsh when compared with the sentences that the legislature has

prescribed for what the court considered more serious crimes, *id*. at ¶ 97-98. To the extent that the court of appeals premised its holding on its disagreement with Glover's aggregate sentence rather than its review of the trial court's findings, it erred in doing so.

{¶ 44} The statute does not permit an appellate court to simply substitute its view of an appropriate sentence for that of the trial court. An appellate court's inquiry is limited to a review of the trial court's R.C. 2929.14(C) findings. R.C. 2953.08(G)(2). Only when the court of appeals concludes that the record clearly and convincingly does not support the trial court's findings or it clearly and convincingly finds that the sentence is contrary to law is it permitted to modify the trial court's sentence. *Id.*

{¶ 45} Thus, an appellate court may not reverse or modify a trial court's sentence based on its subjective disagreement with the trial court. And it may not modify or vacate a sentence on the basis that the trial court abused its discretion. Rather, the appellate court's review under R.C. 2953.08(G)(2)(a) is limited. It must examine the evidence in the record that supports the trial court's findings. And it may modify or vacate the sentence only if it "clearly and convincingly" finds that the evidence does not support the trial court's R.C. 2929.14(C)(4) findings. R.C. 2953.08(G)(2)(a).

{¶ 46} Though "clear-and-convincing" is typically thought of as an evidentiary standard, the General Assembly has chosen to use that standard as the measure for an appellate court's review of a trial court's R.C. 2929.14(C)(4) findings. As we have explained, "clear and convincing evidence" is a degree of proof that is greater than a preponderance of the evidence but less than the beyond-a-reasonable-doubt standard used in criminal cases. *Gwynne*, 2023-Ohio-3851, at ¶ 14 (lead opinion), citing *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus. The appellate-review statute does not require that the appellate court conclude that the record supports the trial court's findings before it

may affirm the sentence. Rather, the statute only allows for modification or vacation only when the appellate court "clearly and convincingly finds" that the evidence does *not* support the trial court's findings. R.C. 2953.08(G)(2)(a). "This language is plain and unambiguous and expresses the General Assembly's intent that appellate courts employ a deferential standard to the trial court's consecutive-sentence findings. R.C. 2953.08(G)(2) also ensures that an appellate court does not simply substitute its judgment for that of a trial court." *Gwynne*, 2023-Ohio-3851, at ¶ 15 (lead opinion).

### C. The court of appeals misapplied the appellate-review statute

{¶ 47} Having dealt with the State's propositions of law, we now turn to the court of appeals' application of the appellate-review statute in this case. We conclude that the court of appeals made several errors in its review of the trial court's sentencing findings. Like the court below, we will not review the consecutive sentences for the gun specifications because Glover has not challenged them.

{¶ 48} The court of appeals pointed to two specific findings by the trial court that it held were clearly and convincingly not supported by the record: (1) the trial court's finding that consecutive sentences are not disproportionate to the seriousness of Glover's conduct and to the danger that he poses to the public, 2023-Ohio-1153 at ¶ 99-101 (1st Dist.), and (2) the trial court's finding under R.C. 2929.14(C)(4)(c) that "'[Glover's] criminal history shows a need to protect the public from future crime by the defendant,' " 2023-Ohio-1153 at ¶ 92-95.

{¶ 49} We begin with the R.C. 2929.14(C)(4)(c) criminal-history finding. The court of appeals found that the trial court's finding under this section was clearly and convincingly not supported by the record based on its disagreement with the trial court's consideration of Glover's juvenile adjudication. We need not analyze the correctness of that conclusion, however, because the trial court *also* made a finding under R.C. 2929.14(C)(4)(b), stating that "[a]t least two of the

multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the defendant's conduct."

{¶ 50} Recall that to impose consecutive sentences, a court must make one of three findings under R.C. 2929.14(C)(4)(a) through (c).  Here, the record fully supports the trial court's finding under R.C. 2929.14(C)(4)(b).  Glover's offenses were committed as "part of one or more courses of conduct" and there was a wealth of testimony from the victims and police officers to support the finding that "no single prison term . . . adequately reflects the seriousness of the defendant's conduct." *Id*.  Moreover, neither Glover nor the court of appeals suggested that the trial court's finding under R.C. 2929.14(C)(4)(b) was not clearly and convincingly supported by the record.  Thus, even without the criminal-history finding, R.C. 2929.14(C)'s requirement that a court find "*any* of the following" was satisfied. (Emphasis added.)

{¶ 51} The other finding that the court of appeals concluded was clearly and convincingly not supported by the record was the trial court's finding under R.C. 2929.14(C) that consecutive sentences are "not disproportionate to the seriousness of the defendant's conduct and the danger the defendant poses to the public." *See* 2023-Ohio-1153 at ¶ 101 (1st Dist.).  The trial court cited substantial evidence in the record to support this finding, including the terror that Glover inflicted on his multiple victims, the lasting psychological harm to these victims, Glover's lack of remorse, and Glover's failure to take responsibility for his actions.

{¶ 52} The statutory scheme circumscribes an appellate court's review of a trial court's proportionality finding.  The proportionality requirement is phrased in the negative; R.C. 2929.14(C) does not require that the trial court find that consecutive sentences are proportionate to the seriousness of the defendant's

conduct and the danger he poses to the public before it may impose consecutive sentences. Instead, it requires that the trial court find that consecutive sentences "are not disproportionate" to the defendant's conduct and the danger he poses. *Id*. The appellate-review statute then adds another negative. The appellate court may not reverse simply because it determines that a trial court's proportionality finding is not supported by the record. Rather, it may modify or vacate only when it finds that the record "clearly and convincingly" "does *not* support" the trial court's finding that consecutive sentences are not disproportionate. (Emphasis added.) R.C. 2953.08(G)(2)(a). The negative constructions in both statutes combined with the clear-and-convincing standard constrain the appellate court's review of a trial court's proportionality finding.

{¶ 53} In determining that the trial court's proportionality finding was clearly and convincingly not supported by the record, the court of appeals relied in part on its disagreement with the trial court's consideration of Glover's juvenile adjudication for assault on teachers. 2023-Ohio-1153 at ¶ 101 ("The lack of physical harm, combined with Glover's *lack of criminal history*, firmly convinces us that the trial court erred" in its proportionality finding. [Emphasis added.]). The proportionality prong, however, focuses on the defendant's current conduct: the court must find that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." R.C. 2929.14(C)(4). The reference to the "offender's conduct" is to the conduct for which the defendant is being sentenced. A defendant's criminal history is dealt with separately as one of the three possible findings under R.C. 2929.14(C)(4)(a) through (c) that must also be made to impose consecutive sentences. To make a defendant's criminal history a required part of the proportionality finding would render R.C. 2929.14(C)(4)(c) superfluous.

{¶ 54} Other than its disagreement with the trial court's consideration of Glover's juvenile adjudication, the court of appeals did not conclude that any of the

considerations relied upon by the trial court were unsupported by the record. Rather, it placed less significance on the harms inflicted by Glover than did the trial court. It did so primarily on the basis that Glover did not inflict physical harm on any of his victims. 2023-Ohio-1153 at ¶ 101 (1st Dist.).

{¶ 55} There is no requirement in law, however, that consecutive sentences are only appropriate when an offender inflicts physical harm on his victims. The legislature could have prescribed such a scheme, but it did not. As the sentencing court explained, Glover inflicted lasting harm on his victims—harm that may well last longer and have more profound effects than a temporary physical injury. The court of appeals may have disagreed with the trial court's assessment of the magnitude of the harm inflicted by Glover, but this disagreement with the trial court's assessment is far different from concluding that the record clearly and convincingly does not support the trial court's consecutive-sentence findings.

{¶ 56} Indeed, a review of the court of appeals' decision shows multiple instances in which the court strayed beyond its role of evaluating whether the trial court's sentencing findings clearly and convincingly were not supported by the record. For example, in explaining that the trial court erred in its proportionality finding, the appellate court stated, "This is especially true because before trial, the state offered 15 years in exchange for a guilty plea, and after trial, the state recommended a 20-to 25-year sentence." 2023-Ohio-1153 at ¶ 101 (1st Dist.).

{¶ 57} But of course, nothing in the appellate-review statute allows a court of appeals to consider a plea offer or a state's sentencing request in its review of consecutive sentences. The court of appeals must limit its review to the trial court's findings. In addition to amounting to an inappropriate consideration, the court of appeals' statement about the State's position at sentencing was inaccurate. During Glover's sentencing hearing, the assistant prosecutor said that the State "would defer to the Court, as far as what the victims ask," but she noted that "some of the victims asked for the maximum," while "some of them are in the ballpark of 20 to

25 years." As for the pretrial offer, the court of appeals neglected to mention that the State made clear that its offer had been premised on sparing the victims from the additional trauma that testifying at trial would cause, an aim that could no longer be achieved after trial.

{¶ 58} The court of appeals also inaccurately suggested that the State had advocated for concurrent sentences at trial, quoting a passage from the sentencing-hearing transcript in which the assistant prosecutor said, "At a minimum I do not think that whatever sentence the Court imposes for each victim should run consecutive with each other. These were separate incidents, separate dates." *See* 2023-Ohio-1153 at ¶ 60-61 (1st Dist.). Read in context, however, it is clear that the word "consecutive" in the passage quoted above constituted either a stenographer's error or a slip of the tongue by the assistant prosecutor. A fair review of the transcript of the assistant prosecutor's argument makes clear that she was arguing that the sentences related to each victim should *not* run concurrent to each other.

{¶ 59} The court of appeals also strayed from its role when it compared Glover's sentence to the sentences imposed under other statutes and in other cases. The court offered a "selection" of cases in which it found that courts had imposed lesser sentences for "crimes that caused both physical and emotional harm." 2023-Ohio-1153 at ¶ 77 (1st Dist.). But the appellate-review statute asks a court of appeals to review whether the record clearly and convincingly does not support the trial court's findings, R.C. 2953.08(G)(2); it does not ask the court of appeals to engage in a comparative analysis of other cases. In addition to being inconsistent with the appellate-review statute, such an analysis is problematic for at least two other reasons. First, there is no indication that the sample of cases selected by the court of appeals was in any way representative. And second, it fails to account for the myriad of case-specific factors that influence a trial court's sentencing decision in a particular case. *Compare Gwynne*, 2023-Ohio-3851, at ¶ 38 (Fischer, J.,

concurring in judgment only) (concluding that the absence from the appellate record of the presentence-investigation report utilized by the trial court during sentencing prevented the court of appeals and this court from reviewing the trial court's sentencing findings under R.C. 2953.08(G)(2)).

{¶ 60} The court of appeals' comparison of Glover's sentence with the sentences imposed for crimes that involved physical harm—such as rape, assault, and murder—also overlooks the fact that it is the legislature that defines the penalties available for particular crimes. The General Assembly deliberately made aggravated robbery a first-degree felony—along with crimes like aggravated burglary, trafficking in persons, rape, and trafficking more than 50 grams of certain controlled substances. *See* R.C. 2911.01(A)(3) (aggravated robbery); R.C. 2911.11 (aggravated burglary); R.C. 2905.32 (trafficking in persons); 2907.02(A) (rape); R.C. 2925.03(C) (trafficking and aggravated trafficking in drugs). Many of these crimes, such as kidnapping and aggravated robbery, do not necessarily involve physical harm. *See* R.C. 2911.01; R.C. 2905.01. In suggesting that Glover's first-degree felony should be treated more leniently than other first-degree felonies, the court of appeals is second-guessing the General Assembly as much as it is the trial court.

### III. CONCLUSION

{¶ 61} The record in this case does not clearly and convincingly fail to support the trial court's consecutive-sentence findings. In concluding otherwise, the First District Court of Appeals effectively substituted its view for the trial court's. We reverse its judgment and reinstate the sentences imposed by the trial court.

Judgment reversed

and sentences reinstated.

_____

**FISCHER, J., concurring in judgment and concurring in part.**

{¶ 62} I concur in the court's judgment reversing the judgment of the First District Court of Appeals. I also join the portion of the lead opinion analyzing the State's second proposition of law. Because I disagree with the portion of the lead opinion analyzing the State's first proposition of law, however, I do not join that portion of the lead opinion.

**I would hold that in making a proportionality determination under R.C. 2929.14(C)(4), courts are required to consider the aggregate prison term**

{¶ 63} With its first proposition of law, the State has asked us to hold that "[n]either the trial nor the appellate courts are required by R.C. 2929.14(C)(4) to focus on a defendant's aggregate prison term when imposing or reviewing consecutive sentences." The lead opinion concludes that this is a "correct statement[] of the law." Lead opinion, ¶ 42. This conclusion seems to be premised on the lack of any express requirement in R.C. 2929.14(C) that courts consider a defendant's aggregate sentence. *See id.* at ¶ 41, 42. While it is true that the statute contains no explicit requirement that the aggregate sentence be considered, my review of the statute leads me to believe that in order for courts to give effect to the entirety of R.C. 2929.14(C), the aggregate sentence must be considered.

{¶ 64} R.C. 2929.14(C) provides:

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:

. . .

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

{¶ 65} Under R.C. 2929.14(C)(4), the starting point is that sentences will run concurrently. That statutory provision provides that a court may order an offender to serve sentences consecutively only if certain requirements are met. In order to run prison terms consecutively under R.C. 2929.14(C)(4), the sentencing court must first find that "the *consecutive service* is necessary to protect the public from future crime or to punish the offender." (Emphasis added.) Notably, R.C. 2929.14(C)(4) refers to both "consecutive service" and "consecutive sentences." The use of these two distinct terms in such close proximity to each other must mean that they have distinct meanings. *See Huntington Natl. Bank v. 199 S. Fifth St. Co., L.L.C.*, 2011-Ohio-3707, ¶ 17-18 (10th Dist.); *State v. Steele*, 2017-Ohio-7605, ¶ 15 (8th Dist.). Based on the plain language of R.C. 2929.14(C)(4), I conclude that "consecutive service" means the service of multiple prison terms, one after another.

{¶ 66} In my view, the aggregate prison term does not factor into whether "*consecutive service* is necessary to protect the public from future crime or to punish the offender," as this provision requires courts to consider whether the need to protect the public requires that some prison terms be served consecutively. (Emphasis added.) *Id*. At this stage of its analysis, the sentencing court simply determines whether the goals of protecting the public or punishing the offender require that the offender serve some terms consecutively rather than serving all

terms concurrently. No consideration of any potential aggregate prison term is required, because the court is not determining whether any particular combination of consecutive sentences is necessary, but rather, whether some consecutive service—instead of concurrent service—is necessary. If the court determines that consecutive service is necessary, it moves to the next step. *See* R.C. 2929.14(C).

**{¶ 67}** In this next step, the court must consider whether "*consecutive sentences* are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." (Emphasis added.) *Id.* For this step, I believe that courts must consider the aggregate prison term. R.C. Chapter 2929 itself seems to compel such a conclusion, as its framework suggests that the aggregate prison term be considered. R.C. 2929.14(C)(9) states, "When consecutive prison terms are imposed pursuant to [R.C. 2929.14(C)(4)], the term to be served is the *aggregate* of all of the terms so imposed." (Emphasis added.) R.C. 2929.14(C)(9) accordingly treats the consecutive prison terms imposed under R.C. 2929.14(C)(4) as an aggregate unit. It follows that when determining whether "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public" under R.C. 2929.14(C)(4), courts should look to the aggregate of all the prison terms the offender will serve consecutively.

**{¶ 68}** In order to fulfill the mandate of R.C. 2929.14(C)(4), courts must necessarily review the aggregate prison term. That statutory provision requires courts to determine whether "consecutive sentences are not *disproportionate*." (Emphasis added.) *Id.* This raises the question of how a court can determine whether consecutive sentences are not disproportionate (i.e., are proportionate) to the offender's conduct and the danger the offender poses to the public if the court does not know what the aggregate of all the terms would be. In my view, there must be a number involved to determine proportionality, and if a court does not consider the aggregate amount, then what number would the court consider? A

court cannot consider the concurrent sentence, since R.C. 2929.14(C)(4) specifically talks about consecutive sentences. Thus, I conclude that this factor requires courts to consider the aggregate of all terms the offender will be required to serve consecutively, because otherwise there is no other way to conduct a proportionality analysis.

{¶ 69} As R.C. 2929.14(C)(4) is constructed, courts must consider the aggregate term in making a proportionality determination. I accordingly would reject the State's first proposition of law and instead hold that in making a proportionality determination under R.C. 2929.14(C)(4), courts are required to consider the aggregate of all prison terms the offender will be required to serve consecutively.

**I agree with the lead opinion's analysis of**
**the State's second proposition of law**

{¶ 70} I agree with the analysis set forth in the lead opinion related to the State's second proposition of law. For the reasons set forth in the lead opinion, which are in accord with our recent decision in *State v. Jones*, 2024-Ohio-1083, I agree that a sentence can be modified or vacated only when the appellate court "'clearly and convincingly finds' that the record does not support the sentencing court's findings," as stated plainly in R.C. 2953.08(G)(2). *Jones* at ¶ 13, quoting R.C. 2953.08(G)(2).

{¶ 71} Moreover, despite my differing analysis regarding the State's first proposition of law, I agree with the ultimate conclusion—set forth in the lead opinion—that "[t]he record in this case does not clearly and convincingly fail to support the trial court's consecutive-sentence findings." Lead opinion at ¶ 61.

**Conclusion**

{¶ 72} For the reasons set out above, I respectfully concur in judgment and join the portion of the lead opinion analyzing the State's second proposition of law.

———————————

26

**STEWART, J., joined by DONNELLY and BRUNNER, JJ., dissenting.**

**{¶ 73}** Given the opportunity to clarify the law on consecutive sentencing under R.C. 2929.14, this court once again only muddies the waters. To be clear, while there are four votes to reverse the judgment of the First District Court of Appeals—which was set out in a thorough and well-reasoned opinion below—the lead opinion's legal reasoning has not garnered enough votes to announce any rule of law, at least with respect to the State's first proposition of law. And while today's decision is by no means a paragon of clarity, lower courts can be sure that there are four members of this court who believe that trial courts must consider whether the aggregate sentence imposed is disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, *see* opinion concurring in judgment and concurring in part at ¶ 67 (agreeing that courts must consider the aggregate prison term under the disproportionality prong of the statute).

**{¶ 74}** Further, I would hold that the correct standard of review of the record and the trial court's consecutive-sentence findings is de novo, for the reasons I explained in *State v. Gwynne*, 2022-Ohio-4607, ¶ 18-23 ("*Gwynne IV*"), *vacated on reconsideration*, 2023-Ohio-3851 ("*Gwynne V*"). Accordingly, I dissent.

## I. ANALYSIS

### A. Both Sentencing and Reviewing Courts Must
### Consider the Total Sentence Imposed

**{¶ 75}** This case was called a "more appropriate vehicle" to consider "whether an aggregate prison term is a factor in imposing or reviewing consecutive sentences" in the reconsideration of *Gwynne IV*. *Gwynne V* at ¶ 45 (Fischer, J., concurring in judgment only).[3] Frankly, the State's proposition of law on that issue

---

3. The question of whether an aggregate prison term is a factor that must be considered when imposing or reviewing consecutive sentences was squarely before us and answered in *Gwynne IV*. I therefore strongly disagreed with this court's ruling to reconsider and vacate that decision—a ruling made possible when the deciding vote was cast by the justice who had just been appointed to

in this case is weaker than what it argued in *Gwynne IV and Gwynne V*. Here, it asks this court to hold that "[n]either the trial nor the appellate courts are required by R.C. 2929.14(C)(4) to *focus* on a defendant's aggregate prison term when imposing or reviewing consecutive sentences."[4] (Emphasis added.) The State does not argue that courts ought not consider the aggregate sentence; instead, it claims that the trial court in this case did in fact consider the aggregate term before sentencing appellee, Tommy Glover. Perhaps recognizing the State's reticence, the lead opinion spends only one paragraph on this issue, and states that the statute does not require the *appellate* court to consider the aggregate sentence. Lead opinion at ¶ 41-42. In fact, nowhere in the lead opinion does it state that the statute does not require the trial court to consider the aggregate sentence. This is also a departure from the conclusion of the lead opinion in *Gwynne V*, creating even more confusion. *See Gwynne V* at ¶ 21 ("the first dissent simply reads words into the statute when it suggests that the trial court's consecutive-sentence findings must be made and reviewed in consideration of the aggregate sentence to be imposed").

{¶ 76} However, even the dissenting opinion in *Gwynne IV* (and later the lead opinion in *Gwynne V*) recognized that trial courts are at least aware of the aggregate sentence: "When a trial court orders a defendant to serve multiple consecutive prison terms, of course it knows the amount of time that it has sentenced the defendant to serve." *Gwynne IV* at ¶ 70 (Kennedy, J., dissenting). Despite this recognition, the author of the dissenting opinion in *Gwynne IV* also said that courts were not *required* to consider the aggregate sentence; but that is a murky juxtaposition. *See Gwynne V* at ¶ 21. Are trial courts acting beyond their

---

the court by the governor, *see Gwynne V* at ¶ 48 (Stewart, J., dissenting). Vacating the decision in *Gwynne IV* served only to leave the matter unresolved once again.

4. For instance, compare the State's position here with its brief in *Gwynne IV*, in which it argued that proportionality review under the Eighth Amendment to the United States Constitution and Article I, Section 9 of the Ohio Constitution was concerned only with individual sentences, not the cumulative impact of those sentences.

statutory authority when they "of course" know the total time to which a defendant will be sentenced, and if so, should they be reversed for that subconscious consideration, which is apparently not authorized by the statute? Or is the consideration of the aggregate sentence so obvious that R.C. 2929.14(C) does not even need to include the requirement? As the author of the lead opinion in this case noted in another recent opinion, the legislature has the authority to set sentencing guidelines: "It is wholly within the legislative power to determine what consequences attach to a conviction for a crime—*the legislature may grant the court discretion in selecting from the consequences provided by law, or it may remove the court's discretion entirely and mandate certain consequences*." (Emphasis added.) *State v. Daniel*, 2023-Ohio-4035, ¶ 30. Here, the statute gives trial courts discretion to impose consecutive sentences when certain conditions are met, but the statute also requires a trial court to consider the aggregate sentence if it chooses to impose consecutive sentences. *See* R.C. 2929.14(C)(4); *Gwynne IV,* 2022-Ohio-4607, at ¶ 13, *vacated on reconsideration*, 2023-Ohio-3851.

{¶ 77} Unlike the lead opinion—which does not articulate a clear standard, leaving sentencing courts and reviewing courts without guidance and likely leading to inconsistent sentences throughout the state[5]—I would hold that the same legal analysis applies in this case as did in *Gwynne IV*: courts *must* consider the aggregate sentence they are imposing. Without repeating the analysis from *Gwynne IV*, I

---

5. Comparing this case to Susan Gwynne's case shows why this court's failure to issue a single, clear rule of law in this area will cause inconsistent sentences across the state. Glover committed six armed robberies and five kidnappings, and yet he received five years *less* than Gwynne, who committed nonviolent burglaries and thefts. *See Gwynne IV* at ¶ 4. Their convictions were not comparable, and the appellate courts involved in each case reached different conclusions in reviewing their consecutive sentences: the First District reduced Glover's aggregate sentence from 60 to 25 years while the Fifth District Court of Appeals upheld Gwynne's 65-year sentence for nonviolent offenses. And this court has chosen to uphold the trial courts' lengthy sentence in both cases, all without announcing how trial and appellate courts should approach this commonplace issue.

emphasize a few points for the edification of advocates and lower courts presented with an aggregate-sentencing question.

**{¶ 78}** As the lead opinion notes, consecutive sentences ought to be the exception, not the rule.  Lead opinion at ¶ 36; *see also* R.C. 2929.41(A); *State v. Hitchcock*, 2019-Ohio-3246, ¶ 21 (lead opinion).  To that end, the legislature placed two guardrails on the imposition of consecutive sentences: (1) trial courts must make additional findings before imposing consecutive sentences, *see* R.C. 2929.14(C)(4), and (2) defendants have the right to challenge the imposition of consecutives sentences on appeal, *see* R.C. 2953.08(G)(2).

**{¶ 79}** The State's first proposition of law in this case concerns the first guardrail on consecutive sentencing, and I would reject that proposition and instead hold that both sentencing and appellate courts must consider the aggregate sentence, i.e., the actual term of incarceration.  R.C. 2929.14(C) requires the courts to consider whether the *consecutive service of the sentences* is necessary to protect the public or to punish the offender and whether the *consecutive sentences* are not disproportionate to the seriousness of the crime and the danger the offender poses to the public.  Again, a majority of the members of this court agree that the trial court must consider the *aggregate* sentence, at least with respect to the proportionality prong.  *See* opinion concurring in judgment and concurring in part at ¶ 67 (agreeing with this conclusion).

**{¶ 80}** The First District's analysis in this case illustrates the folly of claiming that R.C. 2929.14 allows courts to consider only the individual sentences for each offense rather than the aggregate even when those sentences are ordered to be served consecutively.  The appellate court compared Glover's conduct and the aggregate sentence to the conduct and sentences in other cases to determine whether the sentence was disproportionate to the seriousness of Glover's conduct and the danger he posed to the public.  2023-Ohio-1153, ¶ 77 (1st Dist.).  Specifically, the First District focused on the lack of physical harm to the victims

in this case and found that Glover's sentence was disproportionate, especially when compared to other cases in which defendants were convicted of murdering, raping, or otherwise seriously harming their victims, yet received less prison time than Glover. *Id.* This analysis is the exact kind of consideration that this court held was necessary in *Gwynne IV*, 2022-Ohio-4607; courts cannot consider whether the sentence is disproportionate without considering the overall prison term imposed, *see id*. at ¶ 14. For example, in this case, the trial court imposed several three-year sentences on the gun specifications. Was the court to consider only whether each three-year term, considered individually, was disproportionate? All parties would certainly agree that three years is not proportionate to the crimes here, illustrating that focusing on individual sentences and ignoring the total sentence that will actually be imposed is an untenable approach.

{¶ 81} To be clear, courts must consider the actual aggregate sentence, not the hypothetical maximum sentence that could be imposed. The Ohio Attorney General argues in his amicus brief that Glover's receiving 60 years was reasonable, as he could have received 139 years. Specifically, the attorney general argues that the trial court could have imposed an even more extreme "max and stack" sentence but instead showed restraint by imposing 7 years on each of the 6 aggravated-robbery offenses, rather than the maximum 11 years for each count, and by running the kidnapping sentences concurrently with the robbery sentences. First, the attorney general flippantly pretends that there is a serious difference between 60 years in prison and 139 years in prison. More importantly, it does not matter that the trial court could have imposed more time; what matters is how much time the court did in fact impose. The statute does not require the trial court to consider the potential maximum sentence, nor does it require appellate courts to review such a sentence—all parties are concerned only with the sentence actually imposed.

{¶ 82} The State's position is also inconsistent with its argument before the trial court. At sentencing, the State could not even "fathom" what the maximum

sentence would be in this case. Instead, the State fully deferred to the trial court in sentencing, and the only figure it mentioned was 20 to 25 years, which the State claimed was a range that some of the victims had requested. It is hard to square the fact that the State found that 20 to 25 years (or perhaps an even a lower number that the trial court might have imposed) was acceptable at trial but now, on appeal, it argues that a sentence three times as long is nonetheless proportionate under R.C. 2929.14(C).

### B. The Standard of Review Is a De Novo Review to Determine Whether the Sentence Is Not Clearly and Convincingly Supported by the Record and Law

{¶ 83} The second proposition of law presented in this case relates to the second guardrail on the imposition of consecutive sentences in that it addresses the standard appellate courts must apply when reviewing consecutive sentences. *See* R.C. 2953.08(G)(2). While the aggregate-sentencing portion of R.C. 2929.14(C) is relatively clear, it is fair to say that the setup of the appellate-review statute, R.C. 2953.08(G)(2), is rather unorthodox, as even the attorney general concedes. Nonetheless, I maintain that for all the reasons stated in *Gwynne IV*, the correct standard of review is de novo. To find otherwise ignores the legislature's power to grant courts discretion in selecting and reviewing sentences. *See Daniel*, 2023-Ohio-4035, at ¶ 30.

{¶ 84} The statute defines what the standard of review is *not* (i.e., it is not an abuse-of-discretion review). R.C. 2953.08(G)(2). Instead, it allows an appellate court to increase, reduce, or modify a sentence or to vacate the sentence and remand the matter for resentencing if the reviewing court "clearly and convincingly finds" that "the record does not support the sentencing court's findings" or that "the sentence is otherwise contrary to law." *Id.* While the statute's use of the term "clearly and convincingly" may seem out of place, the review process is not as convoluted as some may claim. Under the statute, an appellate court conducts a de

novo review of the record and the trial court's findings in support of consecutive sentences. There is nothing in the statute that requires a reviewing court to give the lower court's findings on the record "special weight" or deference, as the attorney general posits in his amicus reply brief. If the appellate court determines that the record does not support the trial court's consecutive-sentence findings, it may increase, reduce, modify, or vacate the sentence. *See* R.C. 2953.08(G)(2).

**{¶ 85}** Turning to the trial court's specific considerations in this case, the First District correctly noted that (1) the trial court took into account Glover's unclear juvenile adjudication as part of its reasoning at sentencing and (2) the trial court stated that Glover's actions in this case were nearly equal to, or perhaps even worse than, murder (although the trial court walked back that statement). 2023-Ohio-1153 at ¶ 99 (1st Dist.). While not ignoring the fear and emotional trauma that Glover caused, I agree with the First District that these crimes were not on par with crimes that result in serious physical harm or death and thus do not deserve a similar sentence to those crimes. *Id*. at ¶ 98. I am also troubled by the trial court's comments on the number of children Glover has and its allegation that he was not supporting them, as well as the court's remarks about where Glover lived and whether he was employed. These questions have no bearing on Glover's convictions and are not the type of facts the legislature directed trial courts to consider when imposing consecutive sentences. The First District conducted a proper review of the sentence and record in this case, and its decision to reduce the sentence and remand the case to the trial court should be affirmed.

## II. CONCLUSION

**{¶ 86}** For the reasons stated above, and consistent with this court's decision in *Gwynne IV* and my dissent in *Gwynne V*, I would continue to hold that sentencing courts must consider the aggregate sentence under the necessity and proportionality requirements of R.C. 2929.14(C)(4) and that appellate courts must conduct a de novo review of the record to determine whether it does not clearly and

convincingly support the trial court's findings in support of consecutive sentences. I would therefore affirm the First District Court of Appeals.

———————————

Melissa A. Powers, Hamilton County Prosecuting Attorney, and Paula E. Adams, Assistant Prosecuting Attorney, for appellant.

Elizabeth Miller, Ohio Public Defender, and Kimberly E. Burroughs, Assistant Public Defender, for appellee.

Dave Yost, Attorney General, T. Elliot Gaiser, Solicitor General, Michael J. Hendershot, Chief Deputy Solicitor General, and Stephen P. Carney, Deputy Solicitor General, urging reversal for amicus curiae Ohio Attorney General Dave Yost.

Cullen Sweeney, Cuyahoga County Public Defender, and Robert McCaleb and Erika B. Cunliffe, Assistant Public Defenders; Russell S. Bensing; and Raymond T. Faller, Hamilton County Public Defender, and David H. Hoffman, Assistant Public Defender, urging affirmance for amici curiae, Cuyahoga County Public Defender's Office, Ohio Association of Criminal Defense Attorneys, and Hamilton County Public Defender's Office.

———————————