[Cite as *State v. Loy*, 2025-Ohio-5175.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

v.

GLENN E. LOY,

    DEFENDANT-APPELLANT.

CASE NO. 13-25-09

OPINION AND
JUDGMENT ENTRY

---

Appeal from Seneca County Common Pleas Court
Trial Court No. 24 CR 0208

Judgment Affirmed

Date of Decision:  November 17, 2025

---

APPEARANCES:

    *Brian A. Smith* for Appellant

    *Stephanie J. Kiser* for Appellee

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Glenn E. Loy ("Loy") brings this appeal from the judgment of the Common Pleas Court of Seneca County finding him guilty of multiple offenses and sentencing him on those convictions. On appeal Loy alleges that 1) the convictions are against the manifest weight of the evidence; 2) the trial court erred by denying the motion to bifurcate the trial; and 3) the trial court erred by imposing consecutive sentences. For the reasons set forth below, the judgment is affirmed.

*Background*

{¶2} On August 15, 2024, the Seneca County Grand Jury indicted Loy on seven separate counts: 1) Trafficking in a Fentanyl-Related Compound in violation of R.C. 2925.03(A)(1), (C)(9)(a), a felony of the fifth degree; 2) Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), (C)(1)(a), a felony of the second degree; 3) Trafficking in a Fentanyl-Related Compound in violation of R.C. 2925.03(A)(1), (C)(9)(a), a felony of the fifth degree; 4) Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), (C)(1)(a), a felony of the second degree; 5) Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), (C)(1)(a), a felony of the second degree; 6) Corrupting Another with Drugs in violation of R.C. 2925.02(A)(3), (C)(1)(a), a felony of the second degree; and 7) Involuntary Manslaughter in violation of R.C. 2903.04(A), (C), a felony of the first degree. Loy

entered pleas of not guilty on all counts and counsel was appointed for him. On February 4, 2025, Loy filed a motion to bifurcate the trial based upon the dates the events were alleged to have occurred. Counts one and two were alleged to have occurred on November 16, 2023, and the remaining counts were alleged to have occurred on January 3, 2024. Loy noted that discovery for counts three through seven included ten hours of video footage and numerous pages of medical records which were not provided to counsel until January 22, January 27, and January 31, 2025. With the trial scheduled for February 10, 2025, Loy claimed there was not enough time to fully review the information before trial. The State objected to the motion to bifurcate claiming that all of the counts are interrelated as part of a course of criminal conduct. The trial court overruled the motion to bifurcate the trial on February 6, 2025.

{¶3} A jury trial was held February 10-12, 2025. During the trial, the following relevant testimony was presented.

{¶4} C.D. testified that she asked Loy to bring her some cocaine in November of 2023. Loy came to C.D.'s home with a bag of what appeared to be cocaine. Once Loy left, C.D. snorted the substance and went outside. According to C.D., she felt the effects of the drug in 10-15 minutes and realized it was not like what she normally felt when she used cocaine. C.D. began to feel hot and lightheaded so she sat down. C.D. then lost consciousness and woke up after the officers administered Narcan to her. C.D. was taken to the hospital and treated.

{¶5} Detective Kyle Reinbolt ("Reinbolt") confirmed that when he arrived on the scene, C.D. was sitting on the porch, unconscious, and turning blue. Based upon his experience and training, he suspected she had overdosed on an opiate. Reinbolt later learned that C.D.'s blood contained metabolites for cocaine and fentanyl. When Reinbolt questioned C.D. about the source of the drugs, she told him that Loy had given her what she thought was cocaine.

{¶6} C.R. testified that in January 2024, she went to Loy's home and he gave her a bag containing what she though was cocaine. C.R. then brought the drugs back to her home where she shared them with M.B. (her boyfriend), and C.B. (a friend). C.R. thought it was just cocaine, but when she snorted it, it felt "off" and was "not a cocaine high". Tr. 202. C.R. testified that within 10-15 minutes of taking the drugs, she felt tired and her head was spinning. C.R. stated that she eventually lost consciousness and woke up in the hospital after being treated for an opioid overdose. C.R. also testified that after being discharged from the hospital, she, M.B. and C.B. all returned to her home. C.B. laid down on the couch and C.R. and M.B. retired to their bedroom. Later, C.R. was woken up by M.B.'s brother telling them that something was wrong with C.B. They checked on C.B. and found he was not breathing. C.R. started CPR and M.B. called 911. The EMS then transported C.B. back to the hospital and he eventually died.

{¶7} M.B. testified that C.R. went to Loy's home to obtain cocaine. When C.R. returned with the drugs, C.R., M.B., and C.B. all used some. M.B. testified

that soon after taking the drugs he felt tired "which is completely different from doing cocaine." Tr. 288. M.B. observed C.R. and C.B. lose consciousness, so he called 911. According to MB, he was taken to the hospital as well and had to be treated with Narcan.

{¶8} Officer Jared Lindig ("Lindig") of the Fostoria Police Department testified that he responded to the 911 call. Although M.B. did not lose consciousness, Lindig testified that M.B. was having trouble staying awake, his head was nodding down, and he eyes were rolling back in his head. According to Lindig, this is "one of the first indicators" of an overdose. Lindig also testified that he observed C.R. and C.B. both in unconscious states at the home and that both had to be given Narcan. Lindig indicated that he noticed that C.R. was engaged in agonal breathing, which is shallow breaths that sounds similar to snoring and indicates a potential drug overdose.

{¶9} Sergeant Nate Elliott ("Elliott") also responded to the scene in January 2024. Elliott testified that both C.R. and C.B. were unconscious when he arrived and that he administered Narcan to them. Elliott testified that the victims had to have overdosed on an opioid because they responded to the Narcan, which only works on opiates. Elliott observed M.B. standing around in "a zombie-like state" and "quite out of it." Tr. 350. All three had to be transported to the hospital to be treated for an overdose. Elliott later individually interviewed all three of the victims at the hospital. All of the stories were consistent about the timeline and where C.R.

had gone to purchase the drugs. C.R. told him that she had obtained the drugs from Loy. Elliott received the reports back from the blood samples taken from C.R. C.R.'s test showed that her blood contained fentanyl. Later that same day, Elliott again responded to the scene to find CB with no pulse, but still warm. A witness on the scene indicated that CB had returned to the home, fell asleep on the couch and remained there the whole time. The witness told Elliott that CB had been snoring and then stopped. That was when MB checked on CB and found he was not breathing. According to Elliott, the snoring was likely agonal breathing.

{¶10} Dr. Travis Mazur ("Mazur") testified that he was the emergency physician who treated C.R., M.B., and C.B. when they arrived at the emergency room the morning of January 3, 2024. All three were diagnosed with accidental opioid overdose, treated with Narcan, observed until stable, and then released with Narcan kits. According to Mazur, Narcan blocks the effects of an opioid for an hour or so, giving the body time to process and eliminate some of the drug from the system. When the Narcan wears off, the patient will again feel the effects of the original drug. Mazur testified that an overdose of opiates carries a "substantial risk of death" because it depresses the respiratory system and the person could stop breathing. Tr. 395. Mazur testified that C.R., M.B., and C.B. all were at substantial risk of dying due to their overdoses.

{¶11} Robyn Shinaver ("Shinaver") is the toxicology forensic scientist employed by the Lucas County Coroner's Office. Shinaver processed C.D.'s urine

screen. The testing showed that C.D. had cocaine, fentanyl, THC, and morphine in her urine. Shinaver also processed the blood sample taken from C.R. the night of the overdose. C.R.'s blood contained cocaine and fentanyl. Samples of C.B.'s urine and blood were taken when he was taken to the hospital the second time. The testing indicated the presence of cocaine, fentanyl, and methamphetamines in C.B.'s system. According to Shinaver, the levels of fentanyl in C.B.'s system were consistent with C.B. living for a number of hours after the substances were first used.

{¶12} Dr. Thomas Blomquist ("Blomquist") testified as the coroner for Lucas County. Blomquist conducted the autopsy of C.B. and noted that C.B. died in a Toledo Hospital on January 4, 2024. In his professional opinion, the cause of death was "anoxic encephalopathy due to combined drug toxicity" with the drugs being fentanyl and methamphetamine. Blomquist explained that this meant that C.B. stopped breathing, which led to brain death. According to Blomquist, the fentanyl contributed to C.B.'s death. Blomquist testified that all of the drugs in C.B.'s system were likely used within a day. Based upon the levels of fentanyl and norfentanyl (the metabolite of fentanyl), Blomquist estimated that C.B. had used the fentanyl before 3 a.m. on January 3, 2024.

{¶13} Kelsie Pestello ("Pestello") testified that she is a forensic scientist in the drug chemistry section of BCI. She tested the substance brought to her by the

Fostoria Police Department and identified it as 0.65 grams of heroin and fentanyl. Pestello also testified that fentanyl is a controlled substance under Schedule II.

{¶14} The defense then presented the testimony of Austin Kidwell who claimed that M.B. stated that the drugs were purchased from a person named Taylor. C.R. testified on behalf of Loy that she thought that if she did not testify against Loy, she would be charged for C.B.'s death. At the conclusion of the testimony, the jury found Loy guilty on all seven counts.

{¶15} The trial court held a sentencing hearing on February 21, 2025. At the hearing, the trial court found that counts one and two merged for the purpose of sentencing and the State chose to proceed on count two. The trial court also found that counts three, six, and seven also merged for the purposes of sentencing and the State chose to proceed on count seven. The trial court then imposed the following sentence: Count two – five to seven and one-half years in prison; Count four – five to seven and one-half years in prison; Count five – five to seven and one-half years in prison; Count seven – nine to thirteen and one-half years in prison. The court then ordered that the sentences be served consecutive to each other for an aggregate prison term of twenty-four years to twenty-eight and one-half years. Loy appeals from this judgment and raises the following assignments of error.

**First Assignment of Error**

**Because the jury lost its way and created a manifest miscarriage of justice in convicting [Loy], [Loy's] convictions, with respect to all counts, were against the manifest weight of the evidence.**

**Second Assignment of Error**

**Because the trial court acted in an arbitrary, unconscionable, and unreasonable manner in denying [Loy's] motion to bifurcate trial, the trial court's denial of [Loy's] motion to bifurcate trial was an abuse of discretion and violated Rule 14 of the Ohio Rules of Criminal Procedure, and both [Loy's] right to due process and [Loy's] right to a fair trial under the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 10 and 16 of the Ohio Constitution.**

**Third Assignment of Error**

**Because the trial court's findings under R.C. 2929.14(C)(4) were, by clear and convincing evidence, not supported by the record, the trial court's imposition of consecutive sentences was not supported by the record.**

*Manifest Weight of the Evidence*

{¶16} In his first assignment of error, Loy argues that his conviction was against the manifest weight of the evidence.

> When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." . . . A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. . . . Although the appellate court acts as a "thirteenth juror," due deference to the findings made by the fact-finder must still be given.

*State v. Hulbert*, 2021-Ohio-2298, ¶ 23 (3d Dist.) (internal citations removed).

When offenses have merged for the purpose of sentencing, an appellate court

generally need only consider the offense for which the state elected to have the defendant sentenced when reviewing the manifest weight of the evidence. *State v. Cook*, 2024-Ohio-2966 (5th Dist.).

{¶17} In this case, Loy was convicted and sentenced on counts two, four, five, and seven. Counts two, four, and five were all charges that Loy corrupted another with drugs. To prove this offense, the State was required to prove that Loy knowingly furnished a controlled substance to another, causing serious physical harm to that person. R.C. 2925.02(A)(3). Serious physical harm is defined in relevant part as follows:

> (b) Any physical harm that carries a substantial risk of death;
>
> (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

R.C. 2901.01(A)(5). Multiple courts have held that loss of consciousness, irrespective of its duration, satisfies the requirements for a temporary, substantial incapacity as set forth in the statute. *State v. Redman*, 2016-Ohio-860 (3d Dist.). *See also State v. Booker*, 2009-Ohio-1039 (2d Dist.); *State v. Conant*, 2020-Ohio-4319 (4th Dist.); *State v. Chambers*, 2014-Ohio-390 (8th Dist.); *State v. Sales*, 2011-Ohio-2505 (9th Dist.); and *State v. Petty*, 2012-Ohio-2989 (10th Dist.).

{¶18} Count two alleged that Loy furnished drugs to C.D. C.D. testified that Loy brought her what she thought was cocaine. She felt odd after taking it and then lost consciousness before being revived. Reinbolt testified that she was unconscious

and turned blue. Reinbolt also testified that C.D.'s bloodwork showed that the substance she had used was fentanyl. A reasonable juror could conclude from this evidence that Loy furnished a controlled substance to C.D. and as a result she suffered serious physical harm.

{¶19} Count four alleged that Loy furnished drugs to C.R. C.R. testified that she obtained what she though was cocaine from Loy and that she, as well as M.B. and C.B. used that substance. C.R. indicated that she felt tired after taking it and lost consciousness. This was supported by the testimony of M.B., Lindig, and Elliott. Additionally, the body cam footage clearly showed that C.R. was unconscious when police arrived at the house. Mazur testified that C.R.'s overdose carried a substantial risk of death. Based upon this evidence, a reasonable juror could conclude that Loy furnished a controlled substance to C.R. and as a result she suffered serious physical harm.

{¶20} Count five alleged that Loy furnished drugs to M.B. C.R. testified that she obtained the substance used by M.B. from Loy. While M.B. never lost consciousness, he struggled to stay awake after snorting the substance supplied by Loy. Elliott testified that he was in the initial stages of an overdose and that he was transported to the hospital for treatment where he was given Narcan to avoid an overdose. According to Mazur, M.B.'s overdose carried a substantial risk of death. Like with C.R., the body cam footage allowed the jury to see the state of M.B. when the police arrived on the scene. A reasonable juror could conclude from this

evidence that Loy furnished a controlled substance which was used by M.B. and as a result he suffered serious physical harm.

{¶21} Count seven alleged that Loy sold the drugs which resulted in the death of C.B. To prove this, the State needed to show that Loy sold a controlled substance and as a result, C.B. died. *See* R.C. 2903.04 and R.C. 2925.03. No one disputes that C.B. died as a result of a drug overdose. Blomquist testified that the consumption of the fentanyl contributed to C.B.'s death. Blomquist also testified that the fentanyl that contributed to the death was likely taken in the early morning hours of January 3, 2024. C.R. testified that in the very early hours of January 3, 2024, she went to Loy's home to obtain cocaine.[1] She came home with a bag of drugs and they all, including C.B., snorted a line. C.R. testified that she noticed almost immediately that it was not cocaine as she did not get a burst of energy, but became tired instead. M.B. testified that C.R. went to Loy's home to get the drugs and returned with a bag. According to M.B., the three of them used the drugs and M.B. realized something was wrong. Within a short time, both C.R. and C.B. were unconscious, so M.B. called 911. When the police arrived, they found a bag of drugs that was what was left of what they obtained from Loy. C.R. identified the bag as the one Loy gave her. Pestello later tested the contents and identified it as containing heroin and fentanyl.

---

[1] C.R. testified that although Loy fronted her the drugs on January 3, 2024, she understood that Loy expected to be paid for them in the future.

{¶22} Although the medical professionals were able to stabilize C.R., M.B. and C.B. at that time, the three were taken to the hospital. After a period of observation, they were returned to the home with Narcan kits in case there were complications from the overdose. C.R. and M.B. were fortunate and suffered no further consequences. C.B. again suffered an overdose from the fentanyl in his system and stopped breathing. Eventually he died. Blomquist testified that the fentanyl contributed to the death of C.B. A reasonable juror could conclude from this evidence that Loy sold a controlled substance to C.R. which was used by C.B. and as a result he died.

{¶23} Loy argues that the jury lost its way by believing the testimony of C.R. about who sold the drugs to her rather than the testimony of another witness. Loy did present a witness that indicated the drugs were provided by someone named Taylor. Additionally, C.R. stated on the body camera footage that she had obtained the drugs from a friend named Taylor. However, at trial, C.R. testified that she received the drugs from Loy and was subject to cross-examination about her prior statement. The jury, as the trier of fact, determined the credibility of her testimony as well as that of Loy's witness. "When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state." *State v. Hall*, 2014-Ohio-2959, ¶ 28 (4th Dist.). "The choice between credible witnesses and their conflicting testimony rests solely with the

finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986).

{¶24} Loy also argued that the State failed to prove that the fentanyl killed C.B. rather than the methamphetamines also found in his system. Blomquist testified that if only one of the two drugs were in his system, they would still be lethal. However, it was the combination that caused the death in this case. The jury heard this evidence and determined that the fentanyl was a cause of the death.[2] Given the symptoms exhibited by C.B. that he was suffering from an overdose of an opioid (the response to the Narcan and the agonal breathing), the jurors could reasonably conclude that the fentanyl use was a cause of C.B.'s death.

{¶25} Reviewing the evidence presented on each of the counts for which Loy was convicted and sentenced, this Court does not find that the jury clearly lost its way and created a manifest miscarriage of justice. The evidence does not weigh heavily against conviction and instead supports the convictions. Thus, the convictions are not against the manifest weight of the evidence and the first assignment of error is overruled.

---

[2] This Court has previously held that the evidence is sufficient to show that a drug caused the death of a victim if the drug contributed to the death. *State v. Carpenter*, 2019-Ohio-58 (3d Dist.). This case is currently being reviewed by the Supreme Court of Ohio after a conflict was certified with *State v. Seymour*, 2024-Ohio-5179 (10th Dist.), which argued that a "but for" test was appropriate rather than the "contributing factor" test. We note that both of these cases were addressing a sufficiency of the evidence argument, which is not argued in this case.

*Motion to Bifurcate the Trial*

**{¶26}** Loy claims in his second assignment of error that the trial court erred by denying his motion to bifurcate the trial based upon the dates of the offenses. Multiple offenses may be charged in the same indictment if they are of similar character or are part of a course of criminal conduct. Crim.R. 8 (A). However, if it appears that a defendant is prejudiced by a joinder of offenses, the court shall order a separate trial of counts in the indictment. Crim.R. 14. "Issues of joinder and severance are generally reviewed under an abuse of discretion standard". *State v. Plott*, 2017-Ohio-38, ¶ 52 (3d Dist.). An abuse of discretion is only found if the trial court acted unreasonably, arbitrarily, or unconscionably. *State v. Benedict*, 2022-Ohio-3600 (3d Dist.).

> To prevail on a motion to sever, a defendant has the burden of demonstrating that "(1) his rights were prejudiced, (2) that at the time of the motion to sever he provided the trial court with sufficient information so that it could weigh the considerations favoring joinder against the defendant's right to a fair trial, and (3) that given the information provided to the court, it abused its discretion in refusing to separate the charges for trial."

*Plott* at ¶ 55 quoting *State v. Schaim*, 65 Ohio St.3d 51, 59 (1992). "A defendant's claim of prejudice is negated when: (1) evidence of the other crimes would have been admissible as 'other acts' evidence under Evid.R. 5404(B) or (2) the evidence of each crime joined at trial is simple and direct." *Benedict* at ¶ 12 quoting *State v. Ahmed*, 2005-Ohio-2999, ¶ 22 (8th Dist.). If either of these tests is met, then a defendant is not prejudiced by the joinder. *Id*. at ¶ 15.

> Under the "joinder" test, the State is simply required to show that evidence of each crime joined at trial is simple and direct. . . . "Evidence is 'simple and direct' if (1) the jury is capable of readily separating the proof required for each offense, (2) the evidence is unlikely to confuse jurors, (3) the evidence is straightforward, and (4) there is little danger that the jury would 'improperly consider testimony on one offense as corroborative of the other.' " . . . Moreover, the Supreme Court of Ohio has unequivocally stated, "that 'when simple and direct evidence exists, an accused is not prejudiced by joinder regardless of the nonadmissibility of evidence of these crimes as 'other acts' under Evid.R. 404(B)."

*Benedict* at ¶ 14 (internal citations omitted). Evidence of multiple offenses is "simple and direct" when, for example, the offenses involve different victims. *State v. Valentine*, 2019-Ohio-2243, ¶ 49 (5th Dist.).

{¶27} Here, Loy wished to sever counts one and two from counts three through seven. The basis for this motion was that Loy claimed there was insufficient time to review medical records and video relating to the last five counts, which were supplied shortly before the trial date. This Court notes that although Loy claimed that he was prejudiced by the discovery delays, he does not argue this on appeal and he did not ask for a continuance to have more time to review the material before trial.

{¶28} Loy also argued in his motion that some of the evidence that would be admissible for certain counts may not be admissible for the others. The motion failed to identify what Loy thought would be an issue, just that evidence of other acts would be used. However, regardless of whether other acts would be admissible, the evidence for each of the counts is simple and direct. Counts one and two concern

providing drugs to C.D. Counts three and four concern providing drugs to C.R. Count five concerns furnishing drugs to M.B. Counts six and seven concern providing drugs to C.B., which resulted in the death of C.B. There were four different victims, three of which testified at the trial. As the evidence used to prove counts one and two was separate and distinct from that offered to support counts three through seven, it is simple and direct. The factual scenarios of each set of crimes is straightforward and the jury would reasonably be capable of segregating the facts. Additionally, this Court notes that the trial court stated in its entry denying the motion that Loy had indicated he wished to proceed with the trial even if he had not had time to review all of the discovery.[3] The trial court also noted that Loy failed to state any specific examples of prejudice from the joinder. Based upon the record and the arguments before it, the trial court found that there was no need to sever the charges and bifurcate the trials.

{¶29} Having reviewed the record, this Court does not find that the trial court erred in reaching its conclusion. As the evidence used to prove the elements of Loy's offenses was simple and direct, Loy cannot establish prejudice from the failure to sever the counts. The second assignment of error is overruled.

---

[3] We must accept the trial court's factual statement as no transcript of a hearing on January 5, 2025, was provided to this Court, despite receiving transcripts from other pretrial hearings. We note that no party disputes the accuracy of the trial court's statement in its ruling.

*Consecutive Sentences*

**{¶30}** Lastly, Loy claims that the findings of the trial court in support of the imposition of consecutive sentences are not supported by the record. In order to impose consecutive sentences, the trial court must make certain findings. R.C. 2929.14(C)(4).

> (4) If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following:
>
> (a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
>
> (b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.
>
> (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4). The focus of the proportionality analysis is the seriousness of the offender's conduct and the danger posed to the public by the offender. *State v. Grashel*, 2025-Ohio-580, ¶ 34 (4th Dist.).

> The statutory scheme circumscribes an appellate court's review of a trial court's proportionality finding. The proportionality requirement is phrased in the negative; R.C. 2929.14(C) does not require that the trial court find that consecutive sentences are proportionate to the seriousness of the defendant's conduct and the danger he poses to the public before it may impose consecutive sentences. Instead, it requires that the trial court find that consecutive sentences "are not disproportionate" to the defendant's conduct and the danger he poses. *Id*. The appellate-review statute then adds another negative: the appellate court may not reverse simply because it determines that a trial court's proportionality finding is not supported by the record. Rather, it may modify or vacate only when it finds that the record "clearly and convincingly" "does *not* support" the trial court's finding that consecutive sentences are not disproportionate. (Emphasis added.) R.C. 2953.08(G)(2)(a). The negative constructions in both statutes combined with the clear-and-convincing standard constrain the appellate court's review of a trial court's proportionality finding.

*State v. Glover*, 2024-Ohio-5195, ¶ 52. The task before an appellate court is not to conduct a comparative analysis of sentences in other case in relation to the one before it, but to determine whether the record clearly and convincingly does not support the trial court's findings. *Id*. at ¶ 59 and R.C. 2953.08(G)(2).

{¶31} Loy admits that the trial court made all the required findings. Loy's argument is that the finding that the sentence was not disproportionate was not supported by the evidence. A review of the evidence shows that Loy brought a substance he alleged to be cocaine to C.D. in November of 2023 and caused her to overdose as it contained fentanyl. A little over a month later, Loy provided a substance alleged to be cocaine to C.R. which again turned out to contain fentanyl. In both cases the victims thought they were getting something completely different from what was provided and in the second instance a person died as a result. The

remaining victims in both cases suffered serious physical harm and could have died. The State noted that Loy had an extensive criminal history, including two prior trafficking charges, which had resulted in him serving prison terms over the years. Given all of this evidence, this Court does not find that the evidence clearly and convincingly contradicts the trial court's findings. The third assignment of error is overruled.

{¶32} Having found no errors prejudicial to appellant in the particulars assigned and argued, the judgment of the Common Pleas Court of Seneca County is affirmed.

***Judgment Affirmed***

**WALDICK, P.J. and MILLER, J., concur.**

# <u>JUDGMENT ENTRY</u>

For the reasons stated in the opinion of this Court, the assignments of error are overruled and it is the judgment and order of this Court that the judgment of the trial court is affirmed with costs assessed to Appellant for which judgment is hereby rendered. The cause is hereby remanded to the trial court for execution of the judgment for costs.

It is further ordered that the Clerk of this Court certify a copy of this Court's judgment entry and opinion to the trial court as the mandate prescribed by App.R. 27; and serve a copy of this Court's judgment entry and opinion on each party to the proceedings and note the date of service in the docket. *See* App.R. 30.


_____
John R. Willamowski, Judge


_____
Juergen A. Waldick, Judge


_____
Mark C. Miller, Judge

DATED:
/hls