[Cite as *State v. Wilson*, 2026-Ohio-1121.]

IN THE COURT OF APPEALS OF OHIO
FOURTH APPELLATE DISTRICT
WASHINGTON COUNTY

| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| | : | Case No. 24CA15 |
| Plaintiff-Appellee, | : | |
| | : | |
| v. | : | DECISION AND JUDGMENT ENTRY |
| | : | |
| STEVEN R. WILSON, | : | |
| | : | **RELEASED: 03/20/2026** |
| Defendant-Appellant. | : | |

APPEARANCES:

L. Scott Petroff, Athens, Ohio, for appellant.

Nicole Coil, Washington County Prosecuting Attorney, and Kelsey R. Riffle, Assistant Washington County Prosecuting Attorney, Marietta, Ohio, for appellee.

Wilkin, J.

{1} This is an appeal of a Washington County Court of Common Pleas judgment entry in which Steven R. Wilson ("Wilson") was convicted of two counts of tampering with records and one count of failure to register and also found to have violated his community control in a companion case. On appeal, Wilson contends that his convictions and the determination that he violated community control should be reversed because there is insufficient evidence to support these findings. In addition, Wilson asserts that his convictions are against the manifest weight of the evidence. Finally, Wilson argues the sentence was contrary to law because the record does not support the findings that allow for consecutive sentences. After reviewing the parties' arguments, the record, and the applicable law, we find no merit to the assignments of error and affirm the judgment of the trial court.

BACKGROUND

{2} On October 21, 2020, in Case No. 20CR420, a Washington County grand jury returned an indictment that charged Wilson with four counts: three counts of gross sexual imposition, all third-degree felonies, involving three different minor children under the age of 13, in violation of R.C. 2907.05(A)(4) and (C)(2), and one count of failure to comply with underage alcohol laws, an unclassified misdemeanor, in violation of R.C. 4301.69(A) and 4301.99(I). Count 1 alleged that the offense occurred between June and October 2017, and the remaining counts occurred between August and September 2020.

{3} Wilson entered a guilty plea to one count of gross sexual imposition on March 14, 2022. The trial court proceeded to sentencing on the same day, memorialized by an entry of March 28, 2022. Consistent with the plea agreement, the trial court sentenced Wilson to community control with the specific provisions that he serve 120 days in the Washington County Jail, pay the costs of the proceedings, report to the probation department immediately upon release, and have no contact with the three minor victims. The trial court also specifically reserved a 60-month prison sentence and notified Wilson that he was to serve a period of mandatory post-release control for 5 years.

{4} In addition, the trial court entered a finding that Wilson was a Tier II Sex Offender subject to reporting requirements and found that Wilson was notified of those requirements at the time of his plea. A document entitled "Explanation of Duties to Register as a Sex Offender or Child Victim Offender

Duties commencing on or after January 1, 2008," which Wilson signed, was also filed on March 14, 2022.

{5} Subsequently thereto, on March 13, 2024, a new indictment was filed in Case No. 24CR147, alleging three counts:  Count 1, tampering with records, a third-degree felony, in violation of R.C. 2913.42(A)(1) and (B)(4) alleged to have occurred on August 16, 2023; Count 2, tampering with records, a third-degree felony, in violation of R.C. 2913.42(A)(1) and (B)(4) alleged to have occurred on February 7, 2024; and Count 3, failure to register, a third-degree felony, in violation of R.C. 2950.05(F)(2) and 2950.99(A)(1)(a)(ii).  In addition, on March 14, 2024, a motion and complaint were filed alleging that Wilson violated the terms of his community control by virtue of being indicted for two counts of tampering with records and one count of failure to register.

{6} On July 2, 2024, the case proceeded to trial in which the State presented the testimony of five witnesses, and the defense presented the testimony of two witnesses, including Wilson.  The State also entered six exhibits; the defense submitted one exhibit.

{7} First to testify for the State was Randy Stackpole, the probation officer assigned to Wilson, who first had contact with Wilson in March 2022 when Wilson was convicted of GSI.  Stackpole explained that he reviews the probation[1] requirements, including the need to register, with probationers.  Stackpole said that Wilson told him on "Day 1" of probation that he was working at

---

[1] While during the trial witnesses referred to "probation," the proper terminology is "community control."

Morgenstern's in Beverly, Ohio, a deer/meat processing place. Stackpole discussed with Wilson the nature of his employment at Morgenstern's, which included processing deer during deer season. In addition to telling Stackpole he worked during deer season (September through the first week of January), Wilson also told Stackpole he butchered hogs and other animals at other times of the year. Wilson told Stackpole that he had registered and was in compliance. Stackpole explained that while he routinely verifies that a sex offender probationer was registered, he does not, per se, verify the *information* given regarding registration.

{8} After Detective Zachary Kehl initiated an investigation, while Wilson was on community control, Stackpole told Kehl that Wilson was working at Morgenstern's. Kehl then asked Stackpole to accompany him to the workplace. When Stackpole went with Kehl, they saw Wilson "standing in the doorway," of Morgenstern's.

{9} On cross, Stackpole acknowledged that Wilson did not need alcohol services and that Wilson was only required to meet with him every six weeks due to minimal need for probation guidance. Stackpole also explained that when Wilson was informed his home was too close to a school/daycare, Wilson consulted a lawyer to address his living situation. Further, Wilson had registered every six months as required.

{10} Roger Morgenstern, the owner of Morgenstern Deer Processing, testified. Morgenstern said that Wilson "helped me out in deer season some there in the last three years, when we was busy," starting in 2021 or 2022.

Morgenstern said deer season was typically October 1 through February 1. However, Morgenstern also said Wilson worked to help him "take care of the rabbits." Morgenstern explained he did not pay Wilson for his help with the rabbits, but that he gave him cash for the rest of the time terming it "casual labor." Morgenstern testified Wilson knew he was supposed to register, and that he also knew Wilson had to register, but Wilson told Morgenstern he "had that stuff all under control." Wilson was working at Morgenstern's when law enforcement arrived during the second week of March 2024, having already worked there for three days.

{11} During cross, Morgenstern acknowledged that Wilson's "employment" did not involve a written contract, a time card, vacation, or benefits. Morgenstern also said that Wilson did not work full-time. Thus, there were no computer time sheets tracking the specific days Wilson actually worked there. However, Morgenstern reported Wilson as a "casual laborer" on taxes, making it no secret Wilson was working there. In fact, law enforcement officers, including Kehl and Ryan Huffman, knew that Wilson worked at Morgenstern's because they had their deer processed there. Morgenstern's testimony is unclear as to whether Wilson was working on August 16, 2023; however, he admitted that Wilson frequently came in to Morgenstern's during the off-season to "help" with tasks like handling rabbits, possibly without compensation, which Morgenstern described as a "hobby."

{12} Deputy Justin Sheaves of the sheriff's office testified. According to Sheaves, he inputs offender information, including their employment information,

into OffenderWatch, which is used by other agencies in Ohio and other states. Every six months, Sheaves re-verifies the offender's initial registration information by asking the same questions to verify accuracy. Both he and the offender sign the verifications, and a new form is completed each time. While the offender does not handwrite on the form, the offender *does* sign it and verifies the information is correct. The offender also receives a copy of the registration form and the attached duty letter. State's Exhibit 3, the registration form dated February 7, 2024, says that Wilson is "unemployed." State's Exhibit 4 is the duty letter provided by Sheaves to Wilson, along with the registration form. The duty letter indicates the offender must register personally with the sheriff of each county in Ohio where "you are employed," "regardless of where you reside, if you have been employed in that county for more than 3 days or for an aggregate period of 14 days or more in that calendar year."

{13} At no time did Wilson provide employment information to Sheaves; the only information Sheaves had about employment came from Wilson's father, Donald Wilson, during a compliance check in October 2023. Sheaves explained during direct examination that Wilson never himself verified the information that Donald Wilson gave Sheaves; however, Sheaves conceded he did not specifically ask Wilson to verify the information Donald Wilson provided.

{14} During cross-examination, the defense pointed out that the duty letter itself did not specifically state that an offender would be prosecuted for failure to provide *employment* information; rather, it just mentioned failure to provide *residence* information would be prosecuted.

**{15}** The defense further pointed out that on October 11, 2023, Sheaves went to do a compliance check at Wilson's registered home address, 178 Water Street in Lowell.  When Sheaves arrived, Wilson was not there; however, Wilson's father, Donald Wilson, was.  Wilson's father told Sheaves that Wilson was working at Morgenstern's "off and on."  After speaking to Wilson's father, Sheaves wrote the notation "Morgenstern's 'off and on.' "  Sheaves did not tell Wilson's dad to have Wilson personally contact Sheaves about the employment.  Sheaves also did not talk to probation officer Stackpole.  Sheaves acknowledged that the report wherein he noted the information he received from Wilson's father about the Morgenstern employment was misplaced for a time.  He also testified that if the report had been put in the file, he would have entered the information regarding employment into OffenderWatch.  Sheaves clarified that Donald Wilson's information was that Wilson worked at Morgenstern's "off and on," and at the time, he did not know whether it was "off" or "on."  Sheaves also said he doesn't define "employment" for offenders, that he just asks if the offender is "working anywhere."  He acknowledged that Wilson had registered earlier than every six months.  Sheaves also acknowledged that Wilson was trying to comply with requirements regarding his housing.

**{16}** Deputy Jeffrey Farrell, who is employed by sheriff's department, also met with Wilson regarding registration.  Farrell does not have a specific memory of the meeting; however, the form shows that Wilson indicated he was "unemployed" on August 16, 2023.  Farrell stated he initially asks the offender if there are any changes generally, and then specifically goes through each item in

the form.  He also gives both the registration form and the duty letter to the offender, and the offenders usually provide the information to their probation officer.

{17} Finally, the State called Detective Kehl to testify.  Kehl went to Wilson's residence in Lowell, Ohio for a compliance check and Wilson wasn't there.  Wilson's father was there and confirmed that Wilson was at Morgenstern's.  The file, however, said that Wilson was "unemployed."  Kehl went to Morgenstern's the following day (March 8, 2024) to confirm Wilson's employment.  Kehl admitted that he has "always known [Wilson] to be at [Morgenstern's]."  He had personally seen him there.  In the course of the investigation, however, Kehl discovered that Wilson had always said he was "unemployed" when he was completing and updating the registration process.  When confronted by Kehl, Wilson stated that he doesn't work there, that he just "hangs out" at Morgenstern's, that he is "sometimes paid cash," and that "Roger" is his "boss."  Kehl also admitted it's "common knowledge" that Wilson worked at Morgenstern's.

{18} The defense called Donald Wilson, Wilson's father, to testify.  Donald lives right next door to the defendant.  On October 11, 2023, Sheaves came to Donald Wilson's home to look for Steven Wilson.  Donald Wilson told Sheaves that Wilson was not there, that he was at Morgenstern's.  Then, in late February or early March 2024, law enforcement returned to Donald Wilson's home for another compliance check.  Donald Wilson told them that Steven wasn't there; that he was at Morgenstern's.

**{19}** Steven Wilson also testified.  Wilson stated that he had an IEP and always struggled with reading and writing in school, attending special classes. Wilson stated that he remembers the judge going over the form regarding his requirements to register as a Tier II Sex Offender.  At trial, Wilson also initially said he understood the form.

**{20}** As a result of his plea, Wilson stated that he was placed on probation and consistently attended his appointments every month or two.  He stated during these appointments, he engaged in small talk with his probation officer which included discussions about deer hunting and processing.  Wilson mentioned to Stackpole that he had been "helping out" at Morgenstern's off and on.

**{21}** According to Wilson, he was placed on leave from his employment when he was charged with GSI.  Then, the day he signed his agreement he lost his prior job with the laborers' union.  Wilson had trouble finding employment as a convicted felon.  Wilson said that on August 16, 2023, he was not working for anyone, and that he started working for Morgenstern's at the beginning or middle of October 2023.  He said he did not keep that a secret.  Wilson explained that he did not log his hours in a computer, follow a regular schedule, or have taxes deducted, but was paid cash daily, for the most part, every time he was there. He also worked there sporadically.  But when gun season for deer started in West Virginia and Ohio, he was there seven days a week, because that was Morgenstern's busy time. He testified that deer season ended in February 2024.

**{22}** Defense counsel asked Wilson, who appeared to be employed at Morgenstern's at least some of the time, why he put "unemployed" on the registration form if he was working. Wilson replied, "[b]ecause of how sporadic it is. It's a day here, two days there, for a few months. It's hard to really say when I would be employed, just because of how sporadic it is." Wilson said he considered himself "self-employed," and that he did not know that "volunteer work" is considered to be "work." Wilson testified that he lived too close to a school and he made efforts to move when he was notified of that fact.

**{23}** On March 8, 2024, Wilson was at Morgenstern's when Kehl and Stackpole came. Wilson assumed he was getting arrested because he had failed to move at the time they had told him. It had been 45 days since he was told to move, and he had been told he only had 30 days to move. He stated that when law enforcement mentioned an issue with his employment, at the time he considered himself "unemployed" "because dear season being out." he did not consider "self-employment" as "employment," just because he was doing "odd jobs" for which he is sometimes given a couple of dollars. He denied he was trying to facilitate a fraud on the sheriff's office at any time; he believed he provided as accurate information as he could.

**{24}** On cross, Wilson admitted that he recalled signing the form about his duty to register, and the judge reading the form to him at that time. That form specifically states that performing volunteer services is included as "employment." On cross, Wilson contradicted himself and said that he did not know that "helping a friend out" was considered "volunteer work."

**{25}** The form also indicates he has to register in person with the sheriff in the county where he establishes a place of employment if he's been employed for more than 3 days or for an aggregate of 14 days in a calendar year. The State asked, "[y]ou would agree, based on your testimony, that you worked for more than 14 days in the entire calendar year for Morgenstern's Processing," and Wilson stated, "yes." The State further inquired, "[a]nd you would agree that at points of time, based on what you testified, that you worked for them for more than three days in a row?" To which Wilson responded, "[a]t times, yes." Wilson also conceded that he knew he had to register that information but then claimed he didn't think he had to because of how sporadic it was and the fact it was cash employment.

**{26}** Wilson also conceded that he was paid just about every time he was at Morgenstern's. He then claimed that he was not working the day that law enforcement came out to Morgenstern's in March 2024. Even though he had "helped [Morgenstern] out a couple days that week" the day law enforcement came he had just "moved a couple of boxes," but they never "talked about money." He then said he didn't work three days that week in March 2024 when law enforcement saw him there. On redirect, he continued to insist he did not understand the requirements.

**{27}** The following exhibits were also introduced at trial:

State's Exhibit 1: the judgment entry from the GSI plea shows the judge clearly informed Wilson of the reporting requirements,

State's Exhibit 2: Duty to Register Form (signed at the time of Wilson's plea to GSI): contains language that an offender is required to register "in person, with the sheriff of the county in which you

establish a place of employment if you have been employed for more than 3 days or for an aggregate of 14 days in a calendar year." States that "employment" includes "volunteer services." Also requires written notice to the sheriff of changes in employment 20 days before establishing employment or no later than 3 days after change of employment. Further states that failure to comply "will result in criminal prosecution."

State's Exhibit 3: Registration Form from 2/7/2024 in which Wilson attested under penalty of perjury that he was "unemployed."

State's Exhibit 4: Duty Letter provided with 2/7/2024 Registration Form. Includes duty to register employment information.

State's Exhibit 5: Registration Form from 8/16/2023, with attached Duty Letter in which Wilson attested under penalty of perjury that he was "unemployed.".

State's Exhibit 6 (played for the jury): Kehl's interview of Wilson.

Defendant's Exhibit A: Offender Report with notation from 10/11/2023 (authored by Sheaves).

The jury found Wilson guilty of all counts of the indictment in Case No. 24CR147. The trial court set the final community control violation hearing and sentencing for August 1, 2024.

{28} At sentencing and the final community control violation hearing, after taking note that the jury found Wilson guilty of all counts in Case No. 24CR147, the trial court found that Wilson violated the terms of his community control in Case No. 20CR420. The trial court sentenced Wilson to 9 months on each count in Case No. 24CR147 to run concurrently to each other, but consecutive to 48 months in Case No. 20CR420, for a total sentence of 57 months with jail-time credit given.

{29} Wilson submitted this timely appeal with three assignments of error.

ASSIGNMENTS OF ERROR

I. APPELLANT['S] RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO AND UNITED STATES CONSTITUTIONS WAS VIOLATED WHEN HE WAS CONVICTED AND A VIOLATION OF COMMUNITY CONTROL WAS FOUND BASED ON INSUFFICIENT EVIDENCE.

II. THE CONVICTION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF APPELLANT'S RIGHT TO DUE PROCESS AS GUARANTEED BY THE OHIO CONSTITUTION AND THE UNITED STATES CONSTITUTION.

III. THE SENTENCE WAS CONTRARY TO LAW BECAUSE THE RECORD DOES NOT SUPPORT FINDINGS THAT WOULD ALLOW FOR CONSECUTIVE SENTENCES.

FIRST AND SECOND ASSIGNMENTS OF ERROR
PERTAINING TO CASE NO. 24CR147

{30} For ease of analysis, we address Wilson's first and second assignments of error together as they pertain to Case No. 24CR147. On appeal Wilson contends his convictions should be reversed because there is insufficient evidence to support a finding of guilt beyond a reasonable doubt in Case No. 24CR147. Wilson avers that the convictions in Case No. 24CR147 are against the manifest weight of the evidence. Particularly, Wilson asserts that in order to be convicted of the offense of tampering with records, the State must show a benefit or burden resulted from the actions of the offender. He further claims that the State failed to prove this element. Wilson suggests the State did not prove he had a purpose or know that he was facilitating a fraud because he supposedly discussed his employment "openly" with government officials. Regarding the failure to register, he argues that the State failed to prove he changed his employment. Therefore, he argues the State failed to meet its burden, because

R.C. 2950.05(F)(2) requires proof that a person required to register failed to register a *new* place of employment.

{31} The State asserts that Wilson does not deny providing the incorrect information on his registration forms; rather, the State asserts Wilson contends the evidence fails to demonstrate he had the intent or knowledge to commit fraud when he provided the incorrect information. The State acknowledges Wilson *did* inform his probation officer about his employment at least at some point, but that he clearly did *not* personally inform any employee of the sheriff's department of that fact, as the statute requires. As to Wilson's conviction for failure to register, the State asserts that Wilson's own testimony was that he worked during certain seasons, and not others, such that the jury could easily find that on or about March 8, 2024, the employment was "new" or a change in employment from his registered status as "unemployed." The State points out that it could have charged Wilson for every day he failed to register his employment pursuant to R.C. 2950.05, but it chose to indict him with only one count. The State acknowledges that no records were kept at his place of employment, and he was paid in cash, but the State also underscores that Wilson definitely worked at particular times from March 2022 through March 2024, and at no time did he register that employment according to the statutory requirement.

## A. Standard of Review

{32} In determining whether a criminal conviction is against the manifest weight of the evidence, an appellate court reviews the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses

and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), citing *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C.E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

{33} The weight and credibility of evidence are to be determined by the trier of fact. *State v. Kirkland*, 2014-Ohio-1966, ¶ 132. The trier of fact "is free to believe all, part or none of the testimony of any witness," and we "defer to the trier of fact on these evidentiary weight and credibility issues because it is in the best position to gauge the witnesses' demeanor, gestures, and voice inflections, and to use these observations to weigh their credibility." *State v. Dillard*, 2014-Ohio-4974, ¶ 28 (4th Dist.), citing *State v. West*, 2014-Ohio-1941, ¶ 23 (4th Dist.).

{34} In addition, "[a] verdict is not against the manifest weight of the evidence because the finder of fact chose to believe the State's witnesses." *State v. Chancey*, 2015-Ohio-5585, ¶ 36 (4th Dist.), citing *State v. Wilson*, 2014-Ohio-3182, ¶ 24 (9th Dist.), citing *State v. Martinez*, 2013-Ohio-3189, ¶ 16 (9th Dist.). Moreover, " '[w]hile the jury may take note of inconsistencies and resolve or discount them accordingly, * * * such inconsistences (sic.) do not render defendant's conviction against the manifest weight or sufficiency of the evidence.'

" *State v. Corson*, 2015-Ohio-5332, ¶ 31 (4th Dist.), quoting *State v. Proby*, 2015-Ohio-3364, ¶ 42 (10th Dist.), citing *State v. Gullick*, 2014-Ohio-1642, ¶ 10 (10th Dist.).

{**35**}  "When an appellate court concludes that the weight of the evidence supports a defendant's conviction, this conclusion necessarily includes a finding that sufficient evidence supports the conviction."  *State v. Wickersham*, 2015-Ohio-2756, ¶ 27, (4th Dist.), citing *State v. Pollitt,* 2010-Ohio-2556, ¶ 15 (4th Dist.).  A determination that a conviction is not against the manifest weight of the evidence is therefore dispositive of the issue of whether the evidence is sufficient to sustain a conviction.  *Id.*, citing *State v. Lombardi,* 2005-Ohio-4942, ¶ 9 (9th Dist.).  Therefore, in the instant case*,* as it pertains to Case No. 24CR147, we consider Wilson's argument that his convictions are against the manifest weight of the evidence.

## B.  Tampering with Records

{**36**} The first two counts of the indictment allege that Wilson tampered with records, in that he provided incorrect employment information when he updated his sex offender registration forms on August 16, 2023 and February 7, 2024, respectively.  On appeal, Wilson does not challenge the fact that he provided incorrect information to Deputies Sheaves and Farrell.  In fact, as the State points out, Wilson concedes in his brief that, "[t]he facts established at trial show that Appellant failed to provide certain information on his registration form."  Rather, Wilson argues he did not have a "purpose to defraud" or "know he was facilitating a fraud."

**{37}** R.C. 2913.42(A)(1) provides:  "[n]o person, knowing the person has no privilege to do so, and with purpose to defraud or knowing that the person is facilitating a fraud, shall do any of the following:  . . . [f]alsify, destroy, remove, conceal, alter, deface, or mutilate any writing, computer software, data, or record[.]"  R.C. 2913.42(B)(4) provides that the offense is a felony of the third degree "[i]f the writing, data, computer software, or record is kept by or belongs to a local, state, or federal governmental entity[.]"

**{38}** R.C. 2913.01(B) defines "defraud" as "to knowingly obtain, by deception, some benefit for oneself or another, or to knowingly cause, by deception, some detriment to another."  "Deception" is defined in R.C. 2913.01(A) as "knowingly deceiving another or causing another to be deceived by any false or misleading representation, by withholding information, by preventing another from acquiring information, or by any other conduct, act, or omission that creates, confirms, or perpetuates a false impression in another, including a false impression as to law, value, state of mind, or other objective or subjective fact."

**{39}** R.C. 2901.22(A) and (B) define when a person acts purposely and a person acts knowingly:

(A)  A person acts purposely when it is the person's specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is the offender's specific intention to engage in conduct of that nature.

(B) A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances

probably exist. When knowledge of the existence of a particular fact is an element of an offense, such knowledge is established if a person subjectively believes that there is a high probability of its existence and fails to make inquiry or acts with a conscious purpose to avoid learning the fact.

**{40}** The elements of an offense, including tampering with records, may be proven by direct evidence, circumstantial evidence, or both. *State v. Dickerson,* 2023-Ohio-4787, ¶ 46 (8th Dist.), citing *State v. Wells*, 2021-Ohio-2585, ¶ 25 (8th Dist.). "Circumstantial evidence and direct evidence have 'equal evidentiary value.' " *Id.,* citing *Wells* at ¶ 26. "Because direct evidence of a defendant's intent 'will seldom be available,' 'such proof often must be derived from circumstantial evidence.' " *Id., quoting State v. Cammon*, 2018-Ohio-3183, ¶ 19 (8th Dist.); and *State v. Johnson*, 56 Ohio St.2d 35, 38, 381 N.E.2d 637 (1978). Intent therefore " ' "must be gathered from the surrounding facts and circumstances under proper instructions from the court." ' " *State v. Campbell,* 2021-Ohio-2482, ¶ 53 (4th Dist.), quoting *Johnson* at 38, quoting *State v. Huffman*, 131 Ohio St. 27 (1936), paragraph four of the syllabus. Intention is also a question of fact, not a question of law. *Campbell* at ¶ 53, citing *Koenig v. State*, 121 Ohio St. 147, 151, 167 N.E. 385 (1929).

**{41}** Wilson argues that the State proved neither that he caused a detriment to the sheriff's office nor did he receive any benefit from providing incorrect information. However, the statute does not require that an actual detriment be caused, or a benefit be received. Instead, the plain language of that portion of the statute states that he had *purpose* to defraud when providing the false information. The statute also includes the phrase, "knows they are

facilitating a fraud." Thus, the issue is his intent, not the actual result. A review of the record clearly shows that the jury did not lose its way because the State proved through several witnesses that Wilson worked at Morgenstern's throughout the 2022-2024 time period. His claims at trial that he did not know the work at Morgenstern's constituted "employment" are disingenuous because he told his probation officer that he "worked" there and his own testimony confirmed that he worked sporadically throughout 2022-2024. Moreover, he *knew* of the requirement to report this information, as he admitted at trial that a judge read the form to him, and he signed it, acknowledging the obligation to provide his employment details. Further, when he provided the information that he was "unemployed," he *knew* the information was false, or at a minimum misleading. He claimed at trial that he didn't tell the deputies because the employment was "sporadic" and he received cash for his employment. Clearly, by the nature of the reporting statute itself, and the type of information he falsified, Wilson benefited because he had mobility in his employment without supervision from law enforcement, and those members of the public that checked the registry suffered a detriment by being unaware of his employment status.

{42} Even if the State had to prove Wilson's actions actually resulted in a detriment to others or that he received a benefit from falsifying the form, there is enough circumstantial evidence for the jury to find Wilson guilty. Wilson argues that the dates in the indictment do not match up with the dates of this detriment or benefit. But the indictment dates pertain to when he *intended* to defraud others, not when he received a benefit or others suffered a detriment.

{43} The testimony adduced at trial showed that Wilson knew he was not allowed to be around children of a certain age, and that law enforcement would vet where he resided and worked. Wilson reported the employment when it was beneficial for him to show his probation officer he was attempting to successfully complete community control. However, Wilson did not report the fact of his employment to the sheriff's office because it was "sporadic" and a "cash" job. In essence, Wilson received a benefit from not registering his employment at Morgenstern's. Stackpole had told Wilson he was not allowed in homes where children were under the age of 18, but since Morgenstern's was a "public business," Wilson said, "it was kind of nice seeing some of my friends with kids, because he hadn't seen them in a couple of years." Thus, Wilson was in a public place wherein he was not monitored and could have come into contact with children.

{44} As to the detriment to another, law enforcement was hindered in its efforts to find him and verify his employment through official channels. Contrary to his arguments on appeal, the evidence at trial was that although he told his probation officer he was working, only certain members of law enforcement knew he was working at Morgenstern's because they just happened to have their deer processed there. The evidence at trial also showed that Deputy Sheaves found out Wilson was working at Morgenstern's during a compliance check in October 2023, and that was only because Wilson's *father* told Deputy Sheaves. Further, even if some members of local law enforcement knew about his place of employment, law enforcement throughout the state and in other jurisdictions (like

West Virginia, where Wilson testified he frequented before his offenses), did not have that crucial information of where Wilson was employed. Nor did the general public (or the children who were victims in the underlying GSI case), who has access to such sex offender databases.[2]

{45} At trial, the State clearly showed through Kehl's testimony that the county-wide compliance checks are brief for those who correctly report their information. However, in Wilson's case, because he provided false information, Kehl had to investigate by calling Stackpole, verify the information in the file to determine what information was provided for the registry, go to Wilson's home address, and then go to the employer the following day to investigate, when at the same time, he could have been investigating other cases. While both the place of Wilson's home address and employment addresses were in the same county and about ten miles apart, they were in different areas, so Kehl had to travel from one place to another. Further, while the county completes about 150-170 compliance checks, about 20 of them require extra follow-up work, and this

---

[2] R.C. 2950.02(A) contains a determination and declaration by the general assembly that states in part:

> (1) If the public is provided adequate notice and information about offenders and delinquent children who commit sexually oriented offenses or who commit child-victim oriented offenses, members of the public and communities can develop constructive plans to prepare themselves and their children for the offender's or delinquent child's release from imprisonment, a prison term, or other confinement or detention. This allows members of the public and communities to meet with members of law enforcement agencies to prepare and obtain information about the rights and responsibilities of the public and the communities and to provide education and counseling to their children.

Obviously, if accurate information is not provided, the public suffers a detriment because law enforcement and the public cannot prepare as the legislature observed.

case was one of them.  So the fact Wilson provided false information did encumber the sheriff's office, even if only slightly.

{46} The State, therefore, submitted sufficient circumstantial evidence of Wilson's intent to defraud law enforcement when he falsified his registration forms by saying he was "unemployed."  The manifest weight shows the jury did not lose its way when finding Wilson guilty of tampering with records.

### C.  Failure to Register

{47} R.C. 2950.05(F)(2) provides "[n]o person who is required to register a new residence, school, institution of higher education, or place of employment address with a sheriff or with an official of another state pursuant to divisions (B) and (C) of this section shall fail to register with the appropriate sheriff or official of the other state in accordance with those divisions."  Specifically, R.C. 2950.05(B), then in effect at the time, states:

> [i]f an offender * * * is required to provide notice of a residence, school, institution of higher education, or place of employment address change under division (A) of this section * * * the offender * * * not later than three days after changing the place of employment address * * * shall register the new address in the manner, and using the form, described in divisions (B) and (C) of section 2950.04 or 2950.041 of the Revised Code whichever is applicable, with the sheriff of the county in which the offender's * * * new address is located, subject to division (C) of this section.

R.C. 2950.05(I) further provides:

> [a]s used in this section, and in all other sections of the Revised Code that refer to the duties imposed on an offender * * * under this section relative to a change in the offender's * * * place of employment address, "change in address" includes any circumstance in which the old address for the person in question no longer is accurate, regardless of whether the person in question has a new address.

{48} Additionally, R.C. 2950.04, Duty to register-form, provides:

A(1)(c) The offender shall register personally with the sheriff, or the sheriff's designee, of the county in which the offender is employed if the offender resides or has a temporary domicile in this state and has been employed in that county for more than three days or for an aggregate period of fourteen or more days in that calendar year.

"A failure to provide change of address is a strict liability offense." *State v. Gegen,* 2022-Ohio-2462, ¶ 30 (11th Dist.), citing *State v. Blanton,* 2009-Ohio-5334, ¶ 21 (10th Dist.). Therefore, "[c]ulpability is thus not required for a person to be found guilty. *Id.* citing R.C. 2901.21(B).

{49} Here, Wilson essentially argues that he was not required to report the employment at Morgenstern's under the statute for which he was indicted, because the testimony presented at trial was that he "worked at Morgenstern's for years," such that the employment address did not represent a change in information. In this instance, the State presented evidence from Morgenstern that Wilson was working at Morgenstern's the day law enforcement showed up during the second week of March 2024, having already worked three days by that time. The State's witnesses and the defendant himself confirmed that law enforcement came to Morgenstern's on March 8, 2024. Wilson also testified that he was placed on leave from his employment the day he was charged with GSI. Then, the day he signed his agreement was the day he lost his prior job with the laborers' union. Wilson had trouble finding employment as a convicted felon; so, he went to work for Morgenstern's. For the duration of the community control in the GSI case, Wilson told his probation officer he was working at Morgenstern's, Morgenstern confirmed that Wilson worked there on various days throughout 2022-2024, and Wilson's father testified that he told deputies Wilson worked at

Morgenstern's on various dates.  Thus, from the time he initially filled out the information to comply with the sex offender registry, to March 8, 2024, he clearly had a different employment status.  Therefore, we find that the manifest weight of the evidence is that Wilson violated the statute.

### FIRST AND SECOND ASSIGNMENTS OF ERROR
### PERTAINING TO COMMUNITY CONTROL VIOLATION IN CASE NO. 20CR420

#### A.  Standard of Review

**{50}** In challenging the trial court's finding that he violated community control in Case No. 20CR420, Wilson contends that the evidence is insufficient and against the manifest weight by virtue of the fact that the State did not prove the allegations in the indictment arising out of Case No. 24CR147.  The State responds that first, the manifest weight supports the convictions in Case No. 24CR147.  Second, the State says that the burden of proof for a community control violation is a preponderance of evidence standard—a lesser burden of proof.  In so doing, the State points out that language of R.C. 2950.99 involving community control sanction uses the specific word "violation" and *not* "conviction."

#### B.  Analysis

**{51}** Generally, appellate courts review trial court decisions to revoke community control under an abuse of discretion standard of review.  *State v. Cihon*, 2023-Ohio-3108, ¶ 19 (4th Dist.), citing *State v. Crose,* 2023-Ohio-880, ¶ 8 (3d Dist.).  "An abuse of discretion suggests that a decision is unreasonable, arbitrary, or unconscionable."  *Id.,* citing *State v. Adams,* 62 Ohio St.2d 151, 157-158 (1980).

**{52}** We conduct a two-part review for community control revocation cases. *Id.* at ¶ 20, citing *State v. Mehl*, 2022-Ohio-1154, ¶ 7 (4th Dist.). "First, we review the record to determine 'whether there is substantial evidence to support the court's finding that [the offender] violated the terms of * * * community control.' " *Id.*, quoting *Mehl* at ¶ 7, citing *In the Matter of C.M.,* 2009-Ohio-4223, ¶ 17 (4th Dist.). Then, "[i]f substantial evidence exists, 'we review the court's ultimate decision to revoke * * * under the more deferential abuse of discretion standard." *Id.*, quoting *Mehl* at ¶ 7.

**{53}** In the instant case, the motion and complaint charging Wilson with a community control violation alleged he violated the terms of his community control by virtue of being indicted for two counts of tampering with records and one count of failure to register. At the time of the final community control violation hearing, Wilson had not only been indicted for these offenses, but he had also been convicted of them after a jury found him guilty beyond a reasonable doubt. Because we have held that the manifest weight supports these convictions, we also find that substantial evidence exists supporting the court's finding that Wilson violated his community control, and further that the trial court did not abuse its discretion.

**{54}** The State presented sufficient evidence that Wilson tampered with a government record in that he had the requisite intent by receiving a benefit when he submitted false information about his employment status. His intent is further obvious when looking at the burden he placed on law enforcement and the public when he provided false information. Further, Wilson clearly had a duty to register

his employment at Morgenstern's because it was "new" employment from the time he initially registered at the time of his plea and the time he re-registered or updated his registration with Deputy Farrell and Deputy Sheaves. Similarly, the State has shown he violated his community control. We, therefore, overrule the first and second assignments of error.

## THIRD ASSIGNMENT OF ERROR

{55} In his third assignment of error, Wilson asserts that the sentence in his case is contrary to law. While he concedes that the trial court made the appropriate consecutive sentencing findings, he contends the record does not support the findings. The State agrees that the trial court made the proper findings and further responds that the trial court is not obligated to state the reasons for its findings. The State also points to the record to show that there is support in the record for these findings.

### A. Law

{56} Appellate courts apply R.C. 2953.08(G)(2) when reviewing felony sentences. R.C. 2953.08(G)(2) provides, in pertinent part:

> The appellate court may increase, reduce, or otherwise modify a sentence that is appealed under this section or may vacate the sentence and remand the matter to the sentencing court for resentencing. The appellate court's standard for review is not whether the sentencing court abused its discretion. The appellate court may take any action authorized by this division if it clearly and convincingly finds either of the following:
>
> > (a) That the record does not support the sentencing court's findings under division (B) or (D) of section 2929.13, division (B)(2)(e) or (C)(4) of section 2929.14, or division (I) of section 2929.20 of the Revised Code, whichever, if any, is relevant;
> >
> > (b) That the sentence is otherwise contrary to law.

{57} "Ordinarily, appellate courts defer to the broad discretion trial courts have in making sentencing decisions, and R.C. 2953.08(G) also reflects that deference." *State v. Nickell,* 2025-Ohio-1232, ¶ 83 (4th Dist.). This is because "[a] trial judge has the opportunity to preside over the trial, hear witnesses testify, hear the defendant make his allocution directly to the sentencing judge, and hear from the victims at sentencing." *Id.* citing *State v. Blanton,* 2025-Ohio-237, ¶ 30 (4th Dist.), citing *State v. Glover,* 2024-Ohio-5195, ¶ 39. "Thus, appellate courts should possess no inherent right to second guess a felony sentence." *Id.* Except "to the extent specifically directed by statute, 'it is not the role of an appellate court to substitute its judgment for that of the sentencing court as to the appropriateness of a particular sentence.' " (Citations omitted.) *Id.* citing *Blanton,* citing *State v. Glover*, 2024-Ohio-5195, ¶ 39. Accordingly, the appellate court should give "broad deference to a trial court's sentencing decision and not serve as a 'second-tier' sentencing court." *Id.*, citing *Blanton* at ¶ 30, citing *Glover* at ¶ 39.

{58} In that light, the statute does not allow an appellate court to reverse or modify a sentence on the basis that the trial court abused its discretion. *Id. at* ¶ 85, citing *Blanton* at ¶ 31, and *Glover* at ¶ 45. " 'The plain language of R.C. 2953.08(G)(2) requires an appellate court to defer to a trial court's consecutive-sentence findings and the trial court's findings must be upheld unless those findings are clearly and convincingly not supported by the record.' " *State v. Hurst,* 2024-Ohio-5544, ¶ 16, quoting *State v. Gwynne,* 2023-Ohio-3851, ¶ 5 (lead opinion). " 'The clear-and-convincing standard for appellate review of R.C.

2953.08(G)(2) is written in the negative.' " *Id.*, quoting *Gwynne* at ¶ 13.

"Moreover, 'clear and convincing evidence' is 'that measure or degree of proof

which is more than a mere "preponderance of the evidence," but not to the extent

of such certainty as is required "beyond a reasonable doubt" in criminal cases,

and which will produce in the mind of the trier of facts a firm belief or conviction

as to the facts sought to be established.' " *State v. Brummett,* 2025-Ohio-5307,

¶ 33 (4th Dist.), quoting *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph

three of the syllabus.

{59} In the instant case, Wilson challenges the trial court's imposition of a

consecutive sentence.  R.C. 2929.15(B)(1)(c) specifies when the conditions of a

community control sanction are violated, an offender violates a law, or an

offender leaves the state without the permission of the court, the sentencing

court may impose a prison term pursuant to R.C. 2929.14.  As to consecutive

sentences, R.C. 2929.14(C)(4) provides:

> If multiple prison terms are imposed on an offender for convictions of
> multiple offenses, the court may require the offender to serve the
> prison terms consecutively if the court finds that the consecutive
> service is necessary to protect the public from future crime or to
> punish the offender and that consecutive sentences are not
> disproportionate to the seriousness of the offender's conduct and to
> the danger the offender poses to the public, and if the court also finds
> any of the following:
>
> > (a) The offender committed one or more of the multiple
> > offenses while the offender was awaiting trial or sentencing,
> > was under a sanction imposed pursuant to section 2929.16,
> > 2929.17, or 2929.18 of the Revised Code, or was under post-
> > release control for a prior offense.
> >
> > (b) At least two of the multiple offenses were committed as
> > part of one or more courses of conduct, and the harm caused
> > by two or more of the multiple offenses so committed was so

great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

**{60}** We acknowledge that in general, "a statutory presumption exists in favor of concurrent sentences pursuant to R.C. 2929.41(A) and R.C. 2929.14(C)(4) governs the imposition of consecutive terms of imprisonment." *State v. Wyke,* 2025-Ohio-4990, ¶ 42 (4th Dist.), citing *State v. Collins,* 2024-Ohio-2891, ¶ 23 (4th Dist.), citing *Glover* at ¶ 38. Accordingly, "[t]o justify the imposition of consecutive terms of imprisonment, "a trial court must make the findings mandated by R.C. 2929.14(C)(4) at the sentencing hearing and incorporate its findings into its sentencing entry, but the court has no obligation to state reasons to support its findings.' " *Id.* citing *State v. Blair,* 2019-Ohio-2768 ¶ 52, (4th Dist.), citing *State v. Bonnell,* 2014-Ohio-3177, syllabus.  In addition, it is well-established that the trial court is not required to use "talismanic words" as long as the necessary findings can be found in the record and are incorporated into the sentencing entry.  *State v. Wyke,* 2025-Ohio-4990, ¶ 48 (4th Dist.) and *State v. Sines-Riley,* 2025-Ohio-3200, ¶ 12, citing *Bonnell* at ¶ 37.

**{61}** Here, Wilson does not challenge the fact that these findings were made.  Instead, he argues that the record does not support these findings.  We, therefore, according to R.C. 2953.08(F), "review the entire trial-court record, including any oral or written statements made to or by the trial court at the sentencing hearing, and any presentence, psychiatric, or other investigative

report that was submitted to the court in writing before the sentence was imposed." *State v. Sines-Riley,* 2025-Ohio-3200, ¶ 14, quoting *State v. Jones*, 2024-Ohio-1083, ¶ 12.

## B. Analysis

{62} Wilson's argument on appeal focuses on the specific finding that "consecutive sentences are necessary to protect the public from future crime or punish the offender." In the case sub judice, the trial court stated the following at the sentencing hearing as it pertains to consecutive sentences:

> I do find that imposition of consecutive sentences are necessary to protect the public from future crime or to punish the offender and imposition of consecutive sentences are not disproportionate to the seriousness of the offender's conduct and the danger he poses to the public and one or more of the offenses was committed while the offender was awaiting trial, was on community control.

These findings were also outlined in the sentencing entry. While the trial court specifically made these findings, it did not specifically set out its reasons for these findings, but as the State points out, it is not required to do so.

{63} However, the record does support these findings. It is clear that Wilson was on community control for a third-degree felony sex offense involving three juvenile victims when he committed the three new third-degree felonies. In the earlier case, the court underscored Wilson's obligations to notify and his particular reporting requirements. According to the State, in the previous case, it had agreed to "one shot" at community control because Wilson did not have a prior record at the time. The trial court ordered that if he violated his community control, he could face a lengthy prison sentence. Despite knowing that he faced such time, he failed to comply with the requirements, and, in fact, the evidence at

trial showed that he never himself notified the proper authorities of his employment situation in writing as required. He failed to take accountability and instead relied on the actions of others.

{64} Wilson appeared to claim employment to his probation officer when it benefited his compliance with the community control requirements. However, at trial, he argued that he was not working when confronted about his failure to report his employment. He alternatively described his employment as inconsistent or referred to his "employment" as "helping out" or "volunteer work." At no time did Wilson ever provide an adequate explanation for why he told the sheriff's deputy, who reviewed his reporting requirements in the six-month period, that he was "unemployed."

{65} The trial court could have found his failure to take responsibility, and his tendency to shift blame to others, in other words, a general lack of accountability, in determining that Wilson may reoffend, such that the public needed to be protected from future crimes. By examining the victim's impact statements and other evidence, the record shows that Wilson repeatedly failed to appreciate the seriousness of both sets of crimes. He often argued that law enforcement knew where he worked, but he didn't understand that accurately reporting his employment is not just for local law enforcement. It also allows law enforcement across the state and the general public to know where a Tier II Sex Offender is, promoting public safety.

{66} While the PSI was not submitted with the record, Wilson's attorney did point to the PSI during sentencing and stated that Wilson's ORAS score was

low. The record shows that Wilson was compliant in other ways with his community control in the earlier case. However, the record also shows that when Wilson himself addressed the trial court at sentencing and apologized for his conduct, he seemed primarily to have regret that he did not ask more questions about how he should have reported his employment. His regret was self-centered. He seemed to focus on how his actions hurt him, and the family members and friends that support him. He did not seem at all concerned with the feelings or harm he caused to any of the victims or their family members, as he never once mentioned them during his one chance to express remorse, even though he said he had "remorse."

{67} After our review of the entire record, we conclude that the record in the instant case does not clearly and convincingly fail to support the trial court's imposition of consecutive sentences. R.C. 2953.08(G)(2) allows for modification or vacation only when the appellate court "clearly and convincingly finds" that the evidence does not support the trial court's findings. *State v. Hughes,* 2025-Ohio-894, ¶ 49 (4th Dist.), citing *Glover* at ¶ 46. Hence, in light of the foregoing, we do not find that Wilson's sentence is contrary to law.

{68} Accordingly, for all of the foregoing reasons, we overrule Wilson's third assignment of error.

CONCLUSION

{69} For the foregoing reasons, we find no merit to Wilson's three assignments of error and affirm the trial court.

**JUDGMENT AFFIRMED.**

## **JUDGMENT ENTRY**

It is ordered that the JUDGMENT IS AFFIRMED and appellant shall pay the costs.

The Court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this Court directing the Washington County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

Smith, P.J. and Abele, J.:  Concur in Judgment and Opinion.

For the Court,


BY: _____
Kristy S. Wilkin, Judge


## **NOTICE TO COUNSEL**

**Pursuant to Local Rule No. 22, this document constitutes a final judgment entry and the time period for further appeal commences from the date of filing with the clerk.**